471 A.2d 493

David and Thelma CATHCART, Appellants,

v.

KEENE INDUSTRIAL INSULATION, Amatex, Southern Asbestos, Nicolet Industries, Delaware Asbestos and Rubber Co., Johns-Manville, Raybestos-Manhattan, Philip Carey, Owens-Corning Fiberglas, Pittsburgh Corning, Philadelphia Asbestos, Ehret, Baldwin-Hill, Ehret Baldwin-Hill, United Asbestos and Rubber Co. (UNARCO), Pabco Industrial Products Division, GAF, H.K. Porter, J.P. Stevens, Certain-Teed Products Corp., Eagle-Picher Forty-Eight Insulation, Asbestos Textile Co., John Doe.

David and Thelma CATHCART, Appellants,

v.

JOHNS–MANVILLE CORPORATION, Johns-Manville Sales Corporation, Raybestos-Manhattan, Forty-Eight Insulation, Nicolet Industries, Pittsburgh Corning Corporation, GAF, Armstrong Cork Co., UNARCO Industries, H.K. Porter Co., Southern Asbestos Company, Eagle-Picher, Delaware Asbestos & Rubber Co., Fibreboard Corp., Pabco Industrial Products Division, Keene Corp., Glen Alden, Rapid American, Turner & Newall, Keasbey & Mattison Co., Certain-Teed Products Corp., U.S. Rubber Co., Inc., Philip Carey Manufacturing Co., Asbestos Textile Institute, Uni-Royal Inc., Carolina Asbestos Co., J. Franklin Burke Co., General Asbestos Co., Asbestos Textile Co., Thermoid Company, Astenhill Manufacturing Co., Ruberoid Company.

Superior Court of Pennsylvania.

Argued April 25, 1983.

Filed Jan. 13, 1984.

Petition for Allowance of Appeal Denied April 30, 1984.

126

128

Joseph D. Shein and Robert E. Paul, Philadelphia, for appellants.

Charles J. Kolinoski, Philadelphia, for appellees.

Before CERCONE, President Judge, and SPAETH, HESTER, CAVANAUGH, WICKERSHAM, WIEAND and HOFFMAN, JJ.

HESTER, Judge:

Appellants, David and Thelma Cathcart, brought suit on February 6, 1976, at No. 923 February Term, 1976 (hereinafter referred to as the 1976 action) against the following thirty-one defendants (listed alphabetically), by filing a Writ of Summons in Trespass: Amatex Corp.; American Textile; Asbestos Textile Corp.; Baldwin Hill; Benjamin Foster Div. of Amchem Products, Inc.; Carey; Carolina Narrow Fabric Co.; Certain-Teed Products Corp.; Delaware Asbestos and Rubber Co.; Eagle-Picher Industries, Inc.; Eastern Refractory, Inc.; Ehret; Ehret Baldwin Hill; Forty-Eight Insulation Inc.; GAF Corp.; Grant Wilson; Janos Asbestos; Johns-Manville; Keene Industrial Insulation; Nicolet Industries; Owens-Corning, Pabco Industrial Products Division; Pars Manufacturing; Philadelphia Asbestos; Pittsburgh Corning; H.K. Porter Co.; Raybestos-Manhattan; Southern Asbestos; J.P. Stevens; Taylored Industries; and United Asbestos and Rubber Co. (UNARCO). Appellants also named "John Doe" in an apparent attempt to preserve the right to later name other defendants who were unknown at the time. The action was filed against these various defendants because it was thought that they might have supplied asbestos products to appellant David Cathcart's place of employment, the Philadelphia Naval Shipyard, and thus have contributed to Mr. Cathcart's contraction of asbestosis and other related diseases. GAF, Owens-Corning, and Pars accepted service of the summons.[1] Appellants did not formally effect service upon the other defendants[2], although UNARCO took action

1. Acceptance of service is provided for by Pa.R.C.P. No. 1011: "In lieu of service by the sheriff, the defendant may accept service of the writ or complaint."

2. According to the lower court's opinion of April 30, 1981 (1976 case), on February 19, 1976, appellants filed a petition to consolidate forty-five asbestos cases, including the one now before us, for purposes of service, discovery, and trial. This petition was denied by the lower court. Appellants apparently also filed a petition on July 13, 1976, for leave to serve by registered mail, which petition was also denied. There is no record in the copy of the docket entries provided our court of any of this activity. In fact, our disposition of this appeal

which indicated that it was submitting to the jurisdiction of the court, and counsel entered appearances on behalf of Amatex and Certain-Teed.[3]

On September 5, 1978, appellants filed a complaint at a new number, No. 88 (123) September Term, 1978 (hereinafter referred to as the 1978 action) against thirty-one defendants, sixteen of which had also been named in the 1976 action: Asbestos Textile Company; Philip Carey Manufacturing Co.; Certain Teed Products Corporation; Delaware Asbestos and Rubber Co.; Eagle Picher Industries, Inc.; Forty-Eight Insulation, Inc.; GAF Corporation; Johns-Manville Corporation; Keene Corporation; Nicolet Industries, Inc.; Fibreboard Corporation, Pabco Industrial Products Division; Pittsburgh Corning Corporation; H.K. Porter Co., Inc.; Raybestos Manhattan, Inc.; Southern Asbestos Company; and UNARCO Industries, Inc. Fifteen of the defendants were named for the first time: Armstrong Cork Company; Asbestos Textile Institute, Inc.; Asten Hill Manufacturing Co.; J. Franklin Burke Co.; Carolina Asbestos Co.; General Asbestos Co.; Glen Alden, Inc.; Keasbey Mattison Co.; Johns-Manville Sales Corporation; Rapid American, Inc.; Ruberoid Company, Inc.; Thermoid Co.;

has, in general, been hindered by the deplorable state of the record. Pages of the docket entries were not reproduced at all, other pages were only partially reproduced, and the whole was such a maze of chicken-scratching, reduced in size by the miracle of the modern copier so as to be well-nigh impossible to read. In addition, documents which had obviously been presented to the lower court and ruled upon were not included with the record. We hope that this does not signify a trend.

3. Pa.R.C.P. No. 1012 provides that a party may enter a written appearance with an address at which papers may be served, but further provides that "such appearance shall not constitute a waiver of the right to raise any defense including questions of jurisdiction or venue." The mere fact, then, that counsel entered appearances on behalf of Amatex and Certain-Teed did not mean that these two defendants waived the right to challenge (by preliminary objections, Pa.R.C.P. No. 1017(b)(1)) appellants' failure to effect proper service of the Writ of Summons. Unless the two parties whose counsel entered appearances took some further action, they retained the right to later challenge the court's jurisdiction over them. The docket indicates that Amatex did take such further action. There is no indication in the docket that Certain-Teed took such further action.

Turner Newall, Ltd.; Uni-Royal, Inc.; and U.S. Rubber Co. Inc. Owens-Corning and Janos, both of which had been named in the 1976 action and had accepted service of the summons, were not named in the 1978 action. Amatex, on whose behalf an appearance had been entered by counsel in the 1976 action, was similarly not named as a defendant in the 1978 action.

In January, 1978, Pars ruled the plaintiffs to file a complaint in the 1976 case, and when the plaintiffs failed to file a complaint, obtained a judgment of non pros. On September 25, 1980, defendant Raybestos filed a motion for summary judgment in the 1978 action "on behalf of all defendants except Owens Corning Fiberglass Corporation and GAF Corporation." On October 1, 1980, Pittsburgh Corning filed a motion for summary judgment in the 1978 action "in favor of all defendants, against the plaintiffs." Motions for summary judgment were also filed in the same case within the next four months by Pacor, Keene, and Eagle-Picher. All of the defendants named in the 1976 action evidently filed motions for non pros of the 1976 action in November, 1980, although there is no record on the docket of such filing. On January 2, 1981, the plaintiffs finally filed a complaint in the 1976 case. On April 30, 1981, the lower court issued an opinion and order non-prossing the 1976 case as to all named defendants except Owens-Corning, Amatex [4], GAF, Certain-Teed, and UNARCO. On the same date, the lower court also issued an opinion and order in the 1978 case, granting summary judgment and dismissing Thelma Cathcart's claim for emotional distress as to all defendants, denying summary judgment as to GAF, Certain-Teed, and UNARCO on David Cathcart's claims and on Thelma Cathcart's consortium claim, and granting summary judgment in favor of the remaining twenty-eight defendants as to David Cathcart's claims and

4. The lower court's opinion indicates that Owen-Corning and Amatex evidently settled with the plaintiffs and obtained joint tortfeasor releases.

Thelma Cathcart's consortium claim. The plaintiffs filed timely notices of appeal in both actions.[5]

A court properly enters a judgment of non pros when a party to the proceedings has shown a want of due diligence by failing to proceed with reasonable promptitude, when there has been no compelling reason for the delay, and when the delay has caused some prejudice to the adverse party. *Carter v. Amick*, 246 Pa.Super. 530, 534, 371 A.2d 961, 963 (1977). In the case before us, in ruling on the defendants' motions for non-pros of the 1976 action, the lower court held that appellants had not abandoned their claims as to any of the defendants. The lower court also ruled that appellants had not delayed unreasonably with respect to GAF, UNARCO, Certain-Teed, Amatex, and Owens-Corning, since these five defendants had been made parties to the 1976 action, and since there had been activity by appellants (filing a complaint, albeit at a different number and adding many new parties, petitioning to consolidate the 1976. and 1978 actions, and engaging in substantial discovery) which indicated that they were pursuing the 1976 action. With respect to the remaining twenty-five defendants [6], the lower court found: 1) that appellants had delayed

5. Various motions and pleadings were filed at various times by various parties in the two cases. In addition, appeals were taken at various times by certain parties. By order of August 14, 1982, we denied GAF's petitions for permission to appeal from denial of non pros (384 Misc.Docket # 12), from denial of summary judgment (383 Misc.Docket # 12), and from denial of preliminary objections (385 Misc.Docket # 12). By Order of August 24, 1982, we denied GAF permission to appeal from denial of its petition for reconsideration of non pros motion (158 Misc.Docket # 13), quashed GAF's appeals from denial of non pros (1406 Phila., 1981), from denial of motion for summary judgment (1407 Phila., 1981), and from denial of petition for reconsideration (1411 Phila., 1981), quashed UNARCO's appeal from denial of preliminary objections (1395 Phila., 1981), denied as moot GAF's petitions to consolidate, denied GAF's petitions to extend time for filing briefs, and granted appellants' petitions to consolidate appeals at Nos. 1377 and 1378 Phila. 1981. On February 16, 1983, we permitted Johns-Manville Corp., UNARCO, and Amatex to be severed from the appeals now before us.

6. As noted previously, defendant Pars had separately been granted a judgment of non pros.

unreasonably in prosecuting their case by not taking any action from the time that they initiated suit in February, 1976, until they attempted to serve copies of a complaint in January, 1981, a period of almost five years; 2) that appellants' delay "was the result of an effort to save costs" and was "inexcusable"; and 3) that the twenty-five defendants had been prejudiced (although the lower court was not clear as to what the prejudice actually was). Appellants do not challenge these findings.

In arriving at its conclusion that the plaintiffs had delayed unreasonably in waiting almost five years after initiating their suit until attempting to bring the twenty-five defendants within the court's jurisdiction, the court made a "preliminary determination" that twenty-five of the defendants had not waived service of process or subjected themselves to the court's jurisdiction.[7]  It is this portion of the lower court's findings that appellants dispute.  Appellants argue that the twenty-five defendants waived the right to challenge personal jurisdiction because of participation of counsel in court conferences, in the work of a defense counsel committee, and in the drafting of interrogatories which were served upon appellants, and because the defendants received and benefited from answers to interrogatories.  Appellants argue that the twenty-five defendants fall into the same category as the remaining five defendants, and therefore should not have had non pros granted in their favor.

The case before us is one of many asbestos cases filed by the law firm which represents the Cathcarts.  The first of these suits will be referred to herein as *Dellamo*.  On May 19, 1976, a preliminary conference was held pursuant to

7.  Normally, a challenge to the lower court's personal jurisdiction over a defendant is raised in preliminary objections raising a question of jurisdiction, pursuant to Pa.R.C.P. No. 1017(b)(1).  In the case before us, the question of waiver of personal jurisdiction arises because the lower court felt that if some of the defendants had not been properly brought before the court, then action taken by the plaintiffs in the case was not taken *with respect to those defendants,* and the period of delay in prosecuting the action would thus not be tolled as to those defendants.

notice issued under the *Dellamo* caption. The court noted on the record that the defense attorneys

> are here informally. Some of them have indicated they are here on behalf of a client with regard to a specific action, and with respect to any other action against that client, they may or may not be here, and this is purely, if I understand correctly, a courtesy to the Court that they are here discussing the matters in a general fashion.
>
> Mr. Shields, Mr. Sprecher, may represent a given client in a given plaintiff's action, but given another plaintiff, the carrier may be different. The representation may be different. And, these gentlemen are not in a position to bind themselves in that fashion....

The court was careful to point out that if defendants "have not been served, they are not before [the Court]." At a hearing held on September 13, 1976, on the plaintiffs' Petition for Leave to Serve Summons by Registered Mail, the lower court again pointed out:

> I do not presently have before [me] any party or parties except those as to whom Complaint or writs have been issued and/or served. I have only putative defendants as to all other potential defendants as to whom writs have been issued, but have not heretofore been served upon them. Any Order that I would enter ... would have no judicial effect upon anybody except those persons who are—or, parties who are—presently in a formal sense subject to the jurisdiction of the Court.
>
> Any Order that I would enter as to those who have been named but never have submitted voluntarily to the jurisdiction of the Court or who have not appeared in some other fashion or have been properly served in accordance with the statutory proceeding are nothing more than putative defendants....

The lower court thus made it perfectly clear that no defendants were waiving personal jurisdiction by appearing at the conferences.

With regard to the interrogatories, the lower court's order of July 21, 1977 stated: "Service by the Committee of

Counsel, or sub-committee designated thereby of such standard set of interrogatories upon the Committee of Counsel for the adversary parties shall be deemed to be service upon all *counsel of record* for the respective parties." (Emphasis added). The interrogatories filed under the *Dellamo* caption included the following language: "[P]laintiff shall answer these interrogatories notwithstanding the status of actual service on each of the named defendants and without the waiver of service by each of the same defendants."

■ It is well-established that a party may waive objections to personal jurisdiction by consenting to the court's authority. *Radakovich v. Weisman,* 241 Pa.Super. 35, 41, 359 A.2d 426, 429 (1976). For a waiver to occur, a party must take some action (beyond merely entering a written appearance) going to the merits of the case, which evidences an intent to forego objection to the defective service. *O'Barto v. Glossers Stores, Inc.,* 228 Pa.Super. 201, 205, 324 A.2d 474, 476 (1974). It seems clear to us that the defendants and the lower court were careful to avoid waiving the defendants' right to personal service. We agree with the lower court that the twenty-five defendants did not submit to the jurisdiction of the court in the 1976 action.

■ Pennsylvania's statute of limitations for personal injury cases is two years.[8] Evidently in an effort to ameliorate the sometimes-harsh effects of the statute, Pennsylvania courts have adopted what has come to be known as the "discovery rule."[9] Where this rule is applied, the statute of limitations will not begin to run until the plaintiff has

---

**8.** The statute in effect in February, 1976, read:
"Every suit hereafter brought to recover damages for injury wrongfully done to the person, in case where the injury does not result in death, must be brought within two years from the time when the injury was done and not afterwards...." Act of June 24, 1895, P.L. 236, § 2, 12 P.S. § 34. This statute was repealed by the Act of April 28, 1978, P.L. 202, No. 53, § 2(a)[807], effective June 27, 1978. The current statute of limitations (also two years) is found at 42 Pa.C.S. § 5524.

**9.** See *Anthony v. Koppers Co., Inc.,* 284 Pa.Super. 81, 425 A.2d 428 (1981), reversed at 496 Pa. 119, 436 A.2d 181 (1981), for a discussion of the development of this rule in Pennsylvania.

discovered his injury, or, in the exercise of reasonable diligence, should have discovered his injury. See *Schaffer v. Larzelere*, 410 Pa. 402, 189 A.2d 267 (1963). See *Smith v. Bell Telephone Co.*, 397 Pa. 134, 153 A.2d 477 (1959), and *Lewey v. Fricke Coke Co.*, 166 Pa. 536, 31 A. 261 (1895), involving subterranean rights. See *Ayers v. Morgan*, 397 Pa. 282, 154 A.2d 788 (1959), involving medical malpractice. The discovery rule was recently applied by a panel of our Court in *Staiano v. Johns-Manville Corp.*, 304 Pa.Super. 280, 450 A.2d 681 (1982). In *Staiano*, the panel approved a variation of the discovery rule which was articulated in *Volpe v. Johns-Manville Corp.*, 4 Phila. County Reporter 290. Under this "Volpe test," three independent phases of knowledge must be known or knowable to a plaintiff before the statute of limitations begins to run: (1) knowledge of the injury, (2) knowledge of the operative cause of the injury, and (3) knowledge of the causative relationship between the injury and the operative conduct. Although the Volpe test has a nice "ring" to it, it unnecessarily complicates the question of when the statute begins to run. For instance, what does "operative" in "operative cause" mean, and can it be possible for a plaintiff to know the "operative cause" of his injury yet not know the relationship between the "operative conduct" and the injury? The discovery rule has been stated in an understandable manner by our Supreme Court, and we see no reason to complicate the law by adopting a modified version of the rule for cases involving diseases contracted from exposure to hazardous substances. We find that the statute of limitations begins to run in "creeping disease" cases when the plaintiff knows, or reasonably should know: (1) that he has been injured [10], and (2)

**10.** It should be noted that we are not attempting at this time to define "injury." The importance of the definition should be readily apparent. A narrow definition will greatly enlarge the right of plaintiffs, as the statute of limitations will begin to run at a later time. Adoption of a loose definition of "injury" will mean that the statute of limitations could begin running with the discovery of a trivial harm, with the likely consequence that inconsequential lawsuits will be filed in order to avoid statute of limitations problems. In the case before us, according to the deposition testimony, David Cathcart was *permanent-*

that his injury has been caused by another party's conduct. Stating the test in this manner will result in conformity with various other jurisdictions which have addressed this same problem.[11]

As noted previously, appellants filed a second suit in 1978, naming fifteen of the defendants for the first time. The lower court granted summary judgment in favor of these fifteen defendants (as well as thirteen of the sixteen that had been named in both the 1976 and 1978 actions), finding that the statute of limitations barred suit against them. Appellants argue on appeal that, "[s]ince the difficulties in identifying all the defendants are so great...,"[12] [appellants] should be permitted to proceed against a defendant whenever identified." In other words, appellants argue that the statute of limitations did not commence running against defendants until they were identified as having supplied asbestos to David Cathcart's place of employment. We disagree.

In *Keating v. Zemel*, 281 Pa.Super. 129, 421 A.2d 1181 (1980), a medical malpractice case, a panel of our Court was faced with the issue that now confronts us. In that case, the lower court found that an amended complaint filed against the third of three defendants was filed untimely. Our Court affirmed, noting that the plaintiff, exercising reasonable diligence, would unquestionably have been able to identify the third defendant as the party who had left a tube inside the plaintiff. In *Staiano, supra,* an asbestos case, the appellants argued that the statute of limitations

*ly disabled* more than two years prior to the time that he filed his complaint. This was unquestionably sufficient "injury" for statute of limitations purposes. Rather than attempt to formulate a definition at this time, we will await a case in which the issue has been raised in the lower court and properly briefed on appeal.

**11.** See *Nolan v. Johns-Manville Asbestos,* 85 Ill.2d 161, 52 Ill.Dec. 1, 421 N.E.2d 864 (1981); *Harig v. Johns-Manville Products Corp.,* 284 Md. 70, 394 A.2d 299 (1978); *Karjala v. Johns-Manville Products Corp.,* 523 F.2d 155 (8th Cir., 1975).

**12.** Appellants do not specify what the difficulties were. Evidently, the difficulties resulted from appellants' attorneys being too busy to take depositions and file interrogatories.

did not begin to run until they knew "the proper parties to sue" and "the identities of other potential defendants." A panel of our Court rejected this argument, stating: "Here it is enough that the appellant-husband knew that his asbestosis was caused by the inhalation of asbestos dust emanating from asbestos products on the work site. We find no reason to postpone the commencement of the statute until a plaintiff has in addition discovered who manufactured the products that he knows have injured him." Similarly, in the case before us, by using reasonable diligence, appellants could have determined the names of the parties that had provided the asbestos.

Appellants contend that *Grubb v. Albert Einstein Medical Center*, 255 Pa.Super. 381, 387 A.2d 480 (1978), supports their position. *Grubb* is indeed troublesome. In *Grubb*, the plaintiff had been rendered quadriplegic during an operation for a herniated cervical disc. She brought suit against the hospital and against her doctors, who joined the manufacturer (Stryker Corporation) of an allegedly defective bone plug cutter which had been used in the operation. The manufacturer was joined two years and thirteen days after the date of the operation, yet the court held that the manufacturer had been joined within the statutory period, stating: "We find no evidence in the record to indicate that Mrs. Grubb was in a position on December 2, 1964, while still a paralyzed patient at Albert Einstein Medical Center to determine the causal relationship between her injuries and the Stryker plug cutter." 255 Pa.Super. at 399, 387 A.2d at 489.

*Staiano* distinguished *Grubb*, stating that what tolled the statute of limitations in *Grubb* was that the plaintiff had not known, and could not reasonably have been expected to find out, that a defective surgical instrument *of any manufacturer* had caused her injury. *Keating* observed that *Grubb* "is not entirely clear." We note that *Grubb* was a Per Curiam Opinion, in which five of the six sitting judges concurred rather than joined. Although we do not find that

*Grubb* was wrongly decided, we believe that it should be limited to its facts.

We agree with the court in *Huber v. McElwee-Courbis Const.,* 392 F.Supp. 1379, 1383 (E.D.Pa.1974) that the burden is on the injured party, once he discovers the cause of his injuries, whether it be a specific event such as an unsuccessful operation or a hazardous condition such as asbestos in a person's place of employment, to determine within the statutory period (unless there is fraud or concealment) the party or parties whose negligence or breach of duty was responsible for the event or the condition. We find in the case before us that an allegation of mere difficulty in identifying defendants was not sufficient to toll the running of the statute of limitations as to those defendants in the 1978 case that had not been named in the 1976 action.

Appellants argue that those 1978 defendants who were named but not served in the 1976 case are not entitled to summary judgment in the 1978 case, merely because they were named in the 1976 case. Appellants do not explain this argument or cite any cases in support of it. We therefore dismiss this argument without further discussion.

Appellants would have us find that the lower court erred "in failing to follow the cases that state that the statute of limitations does not begin to run until the plaintiff knows the full nature and extent of his injury including its permanency and learns he has a permanent, as contrasted with a temporary, injury." Appellants cite two cases, *Acker v. Palena,* 260 Pa.Super. 214, 393 A.2d 1230 (1978), and *Mitchell v. Hendricks,* 431 F.Supp. 1295 (E.D.Pa.1977), in support of this argument. In *Acker,* the statute of limitations did not begin to run at the time of surgery for a detached retina, because the plaintiff was told that her problem had been corrected and that her vision would return. The plaintiff was not aware that she had been injured by the first physician (whether by incorrect procedure or by misdiagnosis), until she consulted a second physician, who informed her that she had a ruptured sclera which would

require surgical removal of the eye. *Mitchell* similarly involved improper procedure or misdiagnosis which resulted in the plaintiff's condition becoming permanent. These cases simply do not stand for the proposition advanced by appellants. It is not, as appellants contend, that the statute of limitations did not begin to run in each case until the plaintiff knew that the injury was permanent, but rather that the actionable injury was the aggravation of an existing injury, making it permanent. In other words, there was no actionable wrong at all until the defendant made the injury more serious or permanent. Such a situation must be distinguished from one such as in the case before us, in which an injury occurs, purportedly as the result of someone's negligence, and grows increasingly worse because of the nature of the injury rather than because of someone's further action or inaction.

■ Appellants argue that the trial court erred in determining that the statute of limitations on Thelma Cathcart's claim for loss of consortium began to run on the same date that her husband's personal injury claim began to run. In *Staiano*, 304 Pa.Super. at 282, 450 A.2d at 682, a panel of this Court held that a wife's claim for loss of consortium depended on her husband's claim for purposes of the statute of limitations. The lower court in the case before us properly granted summary judgment against Mrs. Cathcart on this claim.

■ Appellants contend that a jury should have been permitted to determine the date that the statute of limitations began to run. Whether the statute of limitations has run on a claim is usually a question of law for the judge; however, at times, a factual determination by the jury may be required. *Smith v. Bell Telephone Co.*, 397 Pa. at 142, 153 A.2d at 481. In the case before us, David Cathcart indicated in his deposition that he was aware, at least by the early part of 1976, that he had contracted asbestosis through exposure to asbestos at his place of employment:

"Q. Who is Dr. Marshall? Dr. Wayne Marshall?

A. I was sent to him from the Navy Yard.

Q. The Navy Yard sent you to him?

A. Yes.

Q. When did the Navy Yard send you to him?

A. It must have been around '73, '74.

. . . .

Q. And, what did Dr. Marshall do for you?

A. Well, he examined me, breathing and everything. And, he put me in the hospital for three days. He started putting tubes, lights down my throat and everything. And he found out there was something wrong with the inside of my lung. And, I stayed there and they gave me other—I took all kinds of x-rays and everything. I must have had about fifteen x-rays or more. I stayed there for three days until they got all done with them. And, he was the one that sent the letter to the shipyard.

Q. Oh, he sent a letter to the shipyard?

A. Yea, total disability.

Q. To tell them you had a disability?

A. I was in California working. I didn't think he was going to let me, leave me go down. They must have overlooked it. I went in, I went down and in three weeks they called me back. . . .

. . . .

Q. Now, they called you back and you went to the Navy Yard?

A. They called me back.

Q. And, somebody gave you a letter from Dr. Marshall?

A. Our master went upstairs and got it and brought it down.

. . . .

Q. And, he gave you the letter from Dr. Marshall?

A. He read it off to me and kept the letter. Well, he did give me the letter.

Q. Did he also read it to you?

A. Yea, he read it off.

. . . .

Q. And, who's Foochie?

A. He's the quarterman.

Q. You gave Foochie the letter?

A. Yes, he read it and he gave me what they called—if you want to go home, if you're sick or anything, they write out a sick pass. They send you home. That's what it must have been like, you know, I was sick. They sent me home that night. That was the last I worked. I didn't work no more.

Q. Why could [sic] you work?

A. He wouldn't let me work. I don't know. The letter says total disability whatever it was, he wouldn't let me work.

Q. What was your disability?

A. Well, at that time, he sent in asbestosis lung. That's what Dr. Marshall had on the letter.

Q. So, your disability was asbestosis of the lung?

A. That's what he said. He had it on the letter. What's what he took to the shipyard.

Q. That's what Dr. Marshall had on the letter?

A. Yes. That's what he had on the letter? I also was over to the Naval Hospital, the doctors over there. They said I had something wrong with my lung, inside of my lung, the Naval Hospital.

Q. That last day, the day you're talking about that you had the letter and they called you back, was that July of '75?

A. It was in '75, now when it was I don't know, I don't know just what month it was.

Q. Was it in the summer time?

A. Yea, it was in the warm weather.

. . . .

Q.  You worked your last day, then did you see Dr. Marshall again?

A.  Yea, I went to him a couple of times for him to look at me and everything.  Then they sent me to Commonwealth to see what they thought of me, to see if I had it or not. . And, they found the same thing inside of my lung, something was wrong with it.  And, they kept going from one to the other, x-rays, x-rays, x-rays.

. . . .

Q.  When you were examined by Dr. Marshall when you were in the hospital, let's see, that was in Pennsylvania Hospital, wasn't it?

A.  Yes, I must have had about twenty x-rays or more.

Q.  You were in there—would it have been June of 1975; is that what you remember?

A.  Around about that time.

Q.  What's when you had all those tests done?

A.  Yes.

. . . .

Q.  Did anybody tell you how you got asbestosis?

A.  No, nobody told me.

Q.  Did you talk to Dr.—

A.  Not until I found out on television what it comes from and all.

Q.  When was that?

A.  I think they advertised on television about '75 or something like that.

Q.  About 1975?

A.  Yes.

Q.  When you saw that, what did you learn from that?

A.  They told you—they told you then it was cancer. They told me down the yard it was asbestosis lung.  Something wrong with the inside of it.  That's what I took, but I

didn't know what it was until I heard it on television. They said it was cancer.

Q. Did you understand how you had gotten asbestosis of the lung?

A. Well, afterward, we found out it was from working around the asbestos down in the fire rooms and engine rooms.

Q. When did you find that out?

A. Well, I didn't find that out until after they found out what was wrong with my lung on the inside, before I found out how I got it. I didn't know. How would I know I had it.

Q. Yes, you found out you had asbestosis of the lung and when you stopped working when you did find out that you had gotten asbestosis of the lung because you had worked with asbestos?

A. How did I know I got it from working with asbestose [sic]?

Q. When did you find that out.

A. After they—after they found out that I had it.

Q. Can you tell me about when that was?

A. Well, it was in '75 when I left the shipyard. It was that year. I mean it was in a couple of months or so.

Q. Within a couple of months—

A. When you took x-rays of my chest.

Q. So—

A. Down there.

Q. So, within a couple of months after you left the shipyard?

A. That I found out what it was, you know, I mean how I got it, from asbestos.

Q. Did you take any papers to Dr. Murray to have him fill out so you could get compensation?

A. No.

Q. Do you remember when you went to see Mr. Brookman, when you first went to see Mr. Brookman?

A. That's when I—'74, '75, when I read it in the paper about this here asbestos and stuff.

Q. Was this after you had stopped working?

A. Oh, yea.

Q. About how soon after you had stopped working?

A. I guess about six months or so.

Q. About six months after you stopped working?

A. Six months or so, yea.

Q. And, that was after you read about it in the paper?

A. Yea, read about it, what came out in the paper about this asbestosis and cancer and all. And, it was on television.

Q. What did you read in the paper and see on television about asbestos; do you remember?

A. I guess it was about, as I say, it was about six months after I got out.

Q. Do you remember what you read, what you heard about it?

A. They said about this asbestosis lung. They say it comes from asbestos from, you know what I mean, from asbestos. What they use on the ships.

Q. It comes from working with asbestos?

A. Yea. That's what it comes from. So, that's how I found out about it.

Q. And, you read about this and you—

A. It was in the papers, it was in the newspapers and it was also on television.

Q. And, then you went to see Mr. Brookman after you learned that?

A. Yea. After I heard about it."

It is clear from David Cathcart's deposition testimony that he learned in the summer of 1975 that he had asbestosis,

and that he found out at least by February, 1976 (when his attorneys filed a writ of summons on his behalf) that he had contracted the disease by working with asbestos at the Philadelphia Naval Shipyard. The affidavit filed by David Cathcart in response to the motions for summary judgment is consistent with his testimony, for it indicates that "he was told he had asbestosis lung in 1975," and "he did not learn for several months anything about his condition or its cause."

Summary judgment is provided for by Pa.R.C.P. No. 1035. Part (b) of the rule states that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Part (d) of the rule provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials or his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not respond, summary judgment, if appropriate, shall be entered against him.

In determining whether there is a genuine issue of fact, the court must take the view of the evidence most favorable to the non-moving party, and any doubts must be resolved against the entry of the judgment. *Husak v. Berkel, Inc.*, 234 Pa.Super. 452, 458, 341 A.2d 174, 177 (1975). We find that there was sufficient basis for the lower court's determination of when the statute of limitations began to run in the case before us, and we find no question of fact which would have required a jury's resolution.

Appellants further argue that since their injuries are continuing ones, the portion of their injuries that occurred within two years of the filing of the complaint is not barred by the statute of limitations. Appellants rely on

*Daniels v. Beryllium*, 211 F.Supp. 452 (E.D.Pa.1962), and on certain language in footnote 3 in *Shadle v. Pearce*, 287 Pa.Super. 436, 441, 430 A.2d 683, 686 (1981), as support for this argument. In *Daniels*, plaintiff Mary Daniels contracted beryllium poisoning, allegedly as the result of pollution caused by the defendant manufacturer. Interpreting the sparse Pennsylvania Law on the subject, the federal district court held that the claim for damages attributable to exposure which occurred more than two years prior to the date of commencement of the suit was barred by the statute of limitations, but that a claim for *aggravation* of the disease *by additional poisoning* within two years prior to commencement of the suit would not be barred. The court held that to find otherwise would, in effect, be granting the defendant a prescriptive right to further contaminate the plaintiff's lungs. We agree with the decision in *Daniels;* however, it is clearly distinguishable from the case now before us. In *Daniels,* the court was concerned with discouraging continuing *tortious conduct,* rather than attempting to extend the statutory period for bringing claims for continuing *injuries.* This distinction was not lost on the panel of our court that decided *Shadle,* for the panel, citing *Daniels,* noted in footnote three: "[T]here was no allegation of a continuing *tort* by the Defendant in this case which aggravated the Plaintiff's condition so as to permit him to recover for harm suffered during the two year period immediately preceding his institution of suit." (Emphasis added). 287 Pa.Super. at 441, 430 A.2d at 686. Appellants in the case before us have not alleged that tortious conduct of the defendants has occurred during the two years prior to filing of the complaint, and we find that the fact that the injuries are continuing ones, caused by the continuous action of asbestos fibers in their bodies, is not sufficient to toll the limitations period for any aggravation of their injuries.

██ A determination was made in 1977 that appellant David Cathcart had pleural thickening, a disease arguably different from asbestosis. Appellants contend that the

statute of limitations for this new injury should begin to run from the time that they discovered or should have discovered this new injury and its cause, and not, as the lower court determined, from the time that they discovered the source of the asbestosis. As support for this position, appellants cite *Shadle, supra,* and *Bayless v. Philadelphia National League Club,* 579 F.2d 37 (3rd Cir.1978).

In *Bayless,* a baseball player for the Philadelphia Phillies suffered a back injury, had various drugs administered to him by the team trainer, and developed complications, including a mental disease (paranoid schizophrenia). More than five years after receiving the drugs, the plaintiff brought suit in Federal District Court against the baseball club. The Federal District Court treated the case as involving two separate injuries, and ruled that both were barred by the statute of limitations. Only the portion of the lower court's order barring the claim for the mental disease injury was appealed. The circuit court on appeal stated that its task was to decide when the limitations period commenced to run. The circuit court, properly applying existing Pennsylvania law, ruled that the limitations period began to run from the time that the plaintiff knew or should reasonably have known the cause of his injury. Since it found that there existed a question of fact as to when the plaintiff knew or should have known the source of his mental disease, the circuit court reversed the grant of summary judgment, and remanded the case for further proceedings. The court did not consider the specific question of whether a second related injury should be treated differently for statute of limitations purposes. In *Shadle,* our Court did deal with this specific question.

In *Shadle,* a dentist's failure to properly treat an abscessed tooth evidently caused the plaintiff to develop a heart condition known as bacterial endocarditis. When a valve transplant operation resulted in the plaintiff's apparent complete recovery, he decided not to sue the dentist. More than two years after the plaintiff learned that the dentist's negligence had caused his initial problem, the

plaintiff developed an aortic aneurysm, which was evidently secondary to the valve transplant, and which rendered him totally incapacitated. In holding the claim for the second injury barred by the statute of limitations, the panel stated: "If we were to hold otherwise under the facts presented here, we would create a concept in the law which would permit an injured plaintiff to have a new limitations period commence for the initiation of an action for personal injuries as of the date when each complication or change in condition arose, despite the fact that no 'new' negligence has occurred which is attributable to the defendant. Such a concept would be contrary to the legislative intent inherent in the creation of periods of limitations in our law." 287 Pa.Super. at 441, 430 A.2d at 685–86.[13] We believe that *Shadle* is directly applicable to the case now before us.

Subsequent to the time that the appeals were filed in the case before us, *Staiano, supra,* was decided. In *Staiano,* the panel noted as dictum that a claim for a "different disease of pleural thickening" would be barred, "for a new limitation period does not start each time a new disease develops from the same tortious conduct of the defendant." 304 Pa.Super. at 294, 450 A.2d at 688. Although the federal courts which decided the *Bayless* case attempted to apply Pennsylvania law, they did not have the benefit of the *Shadle* and *Staiano* decisions. After our decisions in those two cases and in the one now before us, it should be clear that in Pennsylvania a plaintiff's claims for *all* injuries arising out of the same tortious conduct of a defendant must be brought within two years of the time that the plaintiff knows, or in the exercise of reasonable diligence should know, of his initial injury and that the injury was caused by someone's wrongful conduct.

**13.** The panel noted in *Shadle,* 287 Pa.Super. at 441 n. 3, 430 A.2d at 686 n. 3, that it might have reached a different result if the second injury had been a "separate and distinct" one. If such injury were "separate and distinct" in the sense that it had a separate tortious *cause,* then we agree that a limitations period with a different onset date might have applied.

■ In its opinion and order granting summary judgment in the 1978 case, the lower court dismissed Thelma Cathcart's claim for emotional distress sustained at witnessing her husband's injury, finding that the claim was untimely, and also that the claim was deficient because one of the requirements of *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979)—mental distress arising from the sensory and contemporaneous observance of an accident—was absent. Appellants challenge the second of these findings.

In *Hoffner v. Hodge,* 47 Pa.Cmwlth. 277, 407 A.2d 940 (1979), the Commonwealth Court affirmed the denial of a claim for negligent infliction of emotional distress which was based on allegedly negligent surgery performed on a child. The court, citing *Sinn,* found: "The traumatic impact from viewing the negligent injury of one's close relative is wholly absent in this case." 47 Pa.Cmwlth. at 281, 407 A.2d 940. The court therefore affirmed the Administrator's order striking the pertinent counts of the complaint. In *Vattimo v. Lower Bucks Hospital, Inc.,* 59 Pa.Cmwlth. 1, 428 A.2d 765 (1981), rev'd. on other grounds, 502 Pa. 241, 465 A.2d 1231 (1983), the Commonwealth Court, again relying on *Sinn,* ruled that recovery for negligently inflicted emotional distress should be limited to plaintiffs who were at the scene of the injury. In *Amader v. Johns-Manville Corp.,* 514 F.Supp. 1031 (E.D.Pa.1981), a federal district court considered the specific issue now before us, and concluded that recovery could not be had for emotional distress resulting from the development of an occupational disease. The court noted: "Clearly, the Supreme Court of Pennsylvania contemplated a discrete and identifiable traumatic event to trigger recovery." 514 F.Supp. at 1032. The developing case law clearly indicates that a cause of action will not lie for emotional distress negligently caused to a bystander, unless the bystander personally observes an identifiable traumatic incident. The lower court's dismissal of Thelma Cathcart's claim for negligently-caused emotional distress sustained at witnessing her husband's developing disease is affirmed.

The lower court, noting the absence of any physical manifestations of disease in Thelma Cathcart, dismissed her claim for negligent infliction of emotional distress based on the risk to her *own* health. The court held that unless and until she manifested physical injury caused by exposure to asbestos dust, her claim for emotional distress would not be legally cognizable. In *Niederman v. Brodsky*, 436 Pa. 401, 261 A.2d 84 (1970) (in which the Supreme Court abrogated the impact rule in cases involving the negligent infliction of emotional distress), the court cited the Restatement (Second), Torts § 436(2), as being in harmony with their decision. That section states:

> If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to fright, shock, or other similar and immediate emotional disturbance, the fact that such harm results solely from the internal operation of fright or other emotional disturbance does not protect the actor from liability.

We find § 436(A) pertinent to the case before us:

> If the actor's conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for such emotional disturbance.

This latter section was relied upon by a panel of our Court in *Banyas v. Lower Bucks Hospital*, 293 Pa.Super. 122, 437 A.2d 1236 (1981). In that case, the court held that a complaint which alleged that the defendants (a hospital, two physicians, and a nurse) prepared records indicating that an individual's death was due solely to injuries inflicted on him by the plaintiff, was insufficient to state a cause of action for negligent infliction of emotional distress, since the complaint averred no physical harm.

Appellants argue, however, that Mrs. Cathcart did suffer injury in that she ingested asbestos fibers brought home by her husband on his clothes. Appellants rely on *Plummer v.*

*United States*, 580 F.2d 72 (3rd Cir.1978) as support for this argument. In *Plummer*, it was alleged that prison authorities had negligently permitted a prisoner with an active case of tuberculosis to mingle among the general prison population, exposing the plaintiffs to the risk of contracting tuberculosis. Medical tests had disclosed that, although the plaintiffs were suffering no symptoms, their bodies were actually harboring dormant tubercle bacilli, which necessitated a precautionary year-long treatment with drugs. The third circuit found that a cause of action had been stated. We find *Plummer* to be readily distinguishable. In the case before us, Mrs. Cathcart has demonstrated no physical manifestation of disease whatsoever. Her allegation is basically only that she "undoubtedly ingested" asbestos fibers in laundering her husband's clothes over the years. We agree with the lower court that until Thelma Cathcart is able to allege some physical injury or some medically-identifiable effect linked to her exposure to asbestos particles, her claim for negligent infliction of emotional distress is not legally cognizable.

Appellants argue that the lower court failed to consider *Papieves v. Kelly*, 437 Pa. 373, 263 A.2d 118 (1970) when it dismissed their claims for *intentional* infliction of emotional distress. In *Papieves*, citing the Restatement (Second) Torts, § 46 (1965) [14], our Supreme Court noted that "[t]he law has only recently recognized that the freedom from mental distress directly caused by wanton or outrageous conduct is entitled to legal protection independent of any

**14.** § 46. Outrageous Conduct Causing Severe Emotional Distress
(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
   (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
   (b) to any other person who is present at the time, if such distress results in bodily harm.

other cause of action ...." 437 Pa. at 378, 262 A.2d at 121.[15] The Supreme Court concluded that the parties might be entitled to recover for serious mental or emotional distress directly caused by the intentional and wanton acts of mishandling a decedent's body. On the other hand, in *Wisniewski v. Johns-Manville Corp.* (E.D.Pa.1981), a federal district court judge dismissed a claim for emotional distress in an asbestos case, stating: "I am not persuaded that the allegations of the complaint succeed, or can succeed, in charging the defendants with intentional infliction of emotional distress, or with causing emotional distress through negligence so gross and outrageous as to bring this case within the limits of § 46 of the Restatement of Torts (Second)."

Whether we agree with the federal district judge in *Wisniewski,* or feel that plaintiffs have a cause of action within the bounds of *Papieves* and § 46 of the Restatement, will not be addressed in this opinion. In its opinion and order in the 1978 action, the lower court stated: "[I]t is hereby ordered and decreed that wife-plaintiff's claims for infliction of emotional distress are dismissed as to all defendants, and summary judgment is entered in their favor." In the summary of its conclusions, however, the lower court stated: "The claim for the *negligent* infliction of emotional distress incurred as a result of wife-plaintiff's discovery that she was at risk of contracting asbestos-related disease is dismissed as to all defendants for failure to state a legally cognizable cause of action at this time." (Emphasis added). The lower court did not seem to consider (probably because of the muddled nature of appellants' complaint) that the Cathcarts were claiming damages for *intentional* infliction of emotional distress, and it is not clear whether the lower court intended to dismiss this particular claim. Furthermore, due to the state of the record provided our Court, we are not able to determine if the issue was raised by any party in the lower court. We will therefore not

15. See also *Jones v. Nissenbaum,* 244 Pa.Super. 377, 368 A.2d 770 (1976); and Banyas, supra.

consider at this time whether the plaintiffs have a cause of action for intentional infliction of emotional distress.

Appellee GAF argues that the lower court erred in refusing its motion for non pros. Denial of a motion for non pros is not appealable. *O'Brien v. Virginia Mansions*, 277 Pa.Super. 568, 419 A.2d 1295 (1980). Appellee GAF will not be permitted to avoid the rule against appealing from the denial of non pros by raising the issue in an appellee's brief in an appeal which is properly before us.

GAF does not appear to challenge in its brief the lower court's refusal to grant summary judgment in GAF's favor. Twenty-eight of the other defendants, however, filed a "Brief for Appellees and Amici Curiae [16], which did challenge the lower court's refusal to grant summary judgment in favor of GAF. An order denying a motion for summary judgment is interlocutory and not appealable. *Pa. Turnpike Commission v. Atlantic Richfield Co.*, 482 Pa. 615, 621, 394 A.2d 491, 494 (1978); *Hughes v. Pron*, 286 Pa.Super. 419, 424, 429 A.2d 9, 11 (1981). The appellees and amici curiae will not be permitted to avoid the rule against taking an appeal from an order denying summary judgment by raising the issue in a brief filed in response to an appeal.

The lower court's order in the 1976 case is affirmed insofar as it grants non pros in favor of defendants. The

---

**16.** Pa.R.A.P. 531 provides that anyone interested in the questions involved in any matter pending in an appellate court may file a brief amicus curiae in regard to those questions. In addition to the briefs filed by the Cathcarts and GAF, a brief was filed at these appeal numbers "by those parties who obtained judgments in their favor in the court below, together with certain other defendants involved in the asbestos litigation in Philadelphia County who have an interest in the outcome of this appeal." Those parties endorsing this Brief for Appellees and Amici Curiae are: Amatex; Armstrong Cork Co.; Asten-Hill Co.; Baldwin-Ehret-Hill; Baldwin-Hill; Ehret; Carolina Asbestos Company, Inc.; Celotex Corp.; Delaware Asbestos and Rubber Company; Eagle-Picher Industries, Inc.; Fibreboard Corp.; Forty-Eight; Glen Alden Corporation; H.K. Porter Company, Inc.; J.P. Stevens & Co.; Johns-Manville Corp.; Johns-Manville Sales Corp.; Keene Corp.; Nicolet Industries; Owens-Corning Fiberglas Corp.; Pabco Industrial Products Division; Pacor; Pittsburgh Corning Corporation; Rapid-American Corporation; Raybestos-Manhattan, Inc.; Southern Asbestos Company; Thermoid Company; and Uniroyal, Inc.

order in the 1978 case is affirmed insofar as it grants summary judgment in favor of defendants on David Cathcart's claims and Thelma Cathcart's consortium claim. The order in the 1978 case is affirmed insofar as it grants summary judgment in favor of defendants on Thelma Cathcart's claims for negligent infliction of emotional distress. Since Johns-Manville Corp., UNARCO, and Amatex are no longer parties to this appeal, our order does not apply to them. The cases are remanded to the lower court for further proceedings.

Jurisdiction is not retained.

WICKERSHAM, J., files a concurring opinion in which SPAETH and HOFFMAN, JJ., join.

WICKERSHAM, Judge, concurring:

I agree with the major portion of the majority opinion. I write separately, however, to express my concern with the majority's treatment of the "discovery rule" and its application to the statute of limitations. The majority finds that the three-part test as expressed in *Volpe v. Johns-Manville Corp.*,[1] 4 Phila.County Rptr. 290, and as approved in *Staiano v. Johns-Manville Corp.*, 304 Pa.Super. 280, 450 A.2d 681 (1982) "unnecessarily complicates the question of when the statute begins to run." The majority then constructs a "simpler" two-part test.

While this two-step formulation is not incorrect, I feel that it does not clearly recognize that in "creeping disease" cases, as opposed to normal personal injury cases, there may be significant gaps in time intervening between the plaintiff's awareness of his injury, his knowledge of the cause of the injury, and the relationship between the cause and the injury. The three-part "Volpe" test clarifies the different levels of "knowledge" the plaintiff must attain before the statute of limitations begins to run against him.

1. We note that *Volpe* is currently before an *en banc* panel of this court to consider whether plaintiff's cause of action is controlled by admiralty law.

The three-part "Volpe test" is not too complicated; rather, it more clearly identifies the point in time when the statute of limitations begins to run against the plaintiff.

SPAETH and HOFFMAN, JJ., join.