**Elizabeth NAVIN f/k/a Elizabeth Francovich, Plaintiff,**

v.

**William E. BYRNE, III, M.D., Defendant.**

**Civ. A. No. 85–1113.**

United States District Court, M.D. Pennsylvania.

July 1, 1986.

Robert B. Scarlett, Marr & Bennett, Baltimore, Md., Stephen C. Nudel, Harrisburg, Pa., for plaintiff.

S. Walter Foulkrod, III, Michael M. Badowski, Lee C. Swartz, Hepford, Swartz, Menaker & Morgan, Harrisburg, Pa., for defendant.

### MEMORANDUM

CALDWELL, District Judge.

#### I. Introduction and Background.

In this diversity action controlled by Pennsylvania law, defendant, William E. Byrne, III, M.D., has filed a motion for summary judgment pursuant to Fed.R. Civ.P. 56, contending that plaintiff, Elizabeth Navin's, medical malpractice action against him is barred by the statute of limitations. We review the motion under the well established standard set forth in *Hersh v. Allen Products Co., Inc.,* 789 F.2d 230 (3d Cir.1986).

The cause of action arises from defendant's alleged failure to treat plaintiff properly for pelvic inflammatory disease. Plaintiff first consulted with Dr. Byrne in November of 1980, complaining of pain in the right leg and an inability to menstruate. Defendant treated her with birth control pills at first and eventually in February of 1982 performed an exploratory laparotomy. At that time defendant noted the presence of infection but did not remove any tissue. He allegedly explained to plaintiff that he could scrape the infection away periodically in the future if plaintiff desired to have children. Plaintiff last saw defendant on February 12, 1982. Plaintiff then moved to Maryland and came under the care of Dr. David Zisow who saw her for the first time on January 18, 1983. Dr. Zisow performed a laparotomy on April 17, 1983 during which he removed plaintiff's fallopian tubes and left ovary. This lawsuit against defendant was instituted on August 6, 1985.

#### II. Discussion.

■ Because this case is controlled by Pennsylvania law, we look to the applicable Pennsylvania statute of limitations. *See McGowan v. University of Scranton,* 759 F.2d 287 (3d Cir.1985). 42 Pa.C.S. § 5524(2) provides that an "action to recover damages for injury to the person ... caused by the wrongful act or neglect ... or negligence of another" must be commenced within two years. Pennsylvania courts apply the discovery rule to this limitations section. As stated by the Pennsylvania Superior Court:

The now settled delineation of this rule is as follows: "[T]he statute commences when the medical malpractice plaintiff has knowledge or (and this is crucial to the determination) through the exercise of reasonable diligence should have had knowledge of: (1) his injury; (2) the operative cause of his injury; and, (3) the causative relationship between his injury and the operative conduct." *DeMartino v. Albert Einstein Medical Center, Northern District,* 313 Pa.Super. [492] at 500, 460 A.2d [295] at 299. Knowl-

edge of the *negligence* is not a part of the discovery rule. *Id.*

*Held v. Neft,* 352 Pa.Super. 195, ——, 507 A.2d 839, 841 (1986). (emphasis in original).[1]

In accordance with the foregoing rule, plaintiff acknowledges that she knew of her injury in April of 1983 but asserts that she was unable to relate the injury and the operative cause, defendant's treatment of her, until August of 1983. Plaintiff also apparently asserts that she had to have knowledge of defendant's negligence before the limitations period began to run. Specifically, plaintiff argues that she "did have knowledge of the circumstances surrounding the basis for this action but was unable to coherently and intelligently understand the causative of [sic] relationship between her injury and the Defendant's previous treatment and her resulting legal rights until late August of 1983." (Plaintiff's brief in opposition to defendant's motion for summary judgment at pps. 6–7). Plaintiff relies upon her deposition testimony to support this argument:

[Defense Counsel]: Well, I can't be, because I don't know what you told her. What in particular that comes to your mind as to what you may have told your mother about this lawsuit?

[Plaintiff]: I told her that I was suing in this case, because I felt that I had, I thought that I had a case for the situation that I was left in.

Q. Did you describe the situation to your mother?

A. Yes.

Q. When do you first recall telling your mother that you were contemplating filing suit

A. I believe it was 1983, late August, around that time.

Q. Do you recall what you told your mother, at that time?

A. No in specific words what I said to her, but I told her that my husband and I

legally felt, legally felt that we, that there was something wrong and that we were going to pursue with seeing a lawyer, about the, my case.

(Deposition of Elizabeth Navin at 20).

This testimony does not support plaintiff's position. It establishes only that plaintiff had a conversation with her mother in August of 1983 concerning plaintiff's belief that she "had a case" against defendant. It does not establish when plaintiff first realized this. Defendant has referred us to other portions of plaintiff's deposition which we believe are more pertinent to the issue. For example, during an office visit in January of 1982, approximately one year after plaintiff first became a patient of Dr. Byrne, defendant advised plaintiff he believed she had a large cyst on her ovary. Plaintiff's reaction to this information was as follows:

I questioned, not to him, but I questioned in my own mind. He was my gynecologist from the beginning, and, you know, why all of a sudden it was this big, you know. He was examining me beforehand, and why it was not found at that time before it grew to the size that he thought it was.

(Navin deposition at 51).

The laparotomy performed by Dr. Byrne followed on February 3, 1982. Later, after plaintiff had become a patient of Dr. Zisow, she testified to Dr. Zisow's opinion of Dr. Byrne's medical care. That opinion was given on February 14, 1983:

Q. Okay, Fine. Was it, at the second visit now to Doctor Zisow, was it your understanding that Doctor Zisow agreed with Doctor Byrne's assessment of your condition?

A. No. He did not. He found Doctor Byrne's records to be very confusing, and, very confusing in the writing and very confusing on things that he did do in the operation.

---

1. This test was simplified in *Cathcart v. Keene Industrial Insulation,* 324 Pa.Super. 123, 471 A.2d 493 (1984) (en banc) for "creeping disease" cases, *see Chandler v. Johns-Manville Corp.,* 352 Pa.Super. 326, 507 A.2d 1253 (1986), but, apparently, has been retained for use in medical malpractice cases.

He questioned why he didn't do something at that point in time when he had me opened up. Why he didn't do something at that time for me and why he didn't mention in vitro fertilization at that time to me also, why, because it was well-known at that time, why that didn't come up.

(Navin deposition at 90–91).

Plaintiff was questioned as follows concerning her second laparotomy in April of 1983:

Q. Now, when you found out Doctor Zisow had to take your Fallopian tubes and your left ovary out, what were your thoughts as to Doctor Byrne?

A. I questioned to Doctor Zisow why something wasn't done beforehand, and I was given the response that there are good doctors and there are bad doctors.

Q. Okay.

A. Doctor Zisow is the type of person that is not going to say something bad about another person. He isn't that kind of a man, but he did, he was confused on his reports and confused about a procedure.

Q. Now, when in April of 1983, you found out that you had loss [sic] your tubes and one of your ovaries, do you feel Doctor Byrne should have done the same procedure that Doctor Zisow had done?

A. I feel at the time that there, that the infection was not as bad as it was by the time I got to Doctor Zisow, and that he should have taken action instead of just opening me up and closing me and moving things around and making things, stirring things up, the infection up, because that is basically what it did, it agitated the infection.

Q. What led you to believe that?

A. Just from being operated on in February of '82, and experiencing the pain and the suffering from the time that I was operated with Doctor Zisow, and at that point it was so enlarged, the infection was so spread, that I feel that it if Doctor Byrne saw it in the beginning that he should have taken action of some

sort, whatever action he should have taken I don't know.

(Navin deposition at 103–04).

The plaintiff further testified:

Q. Okay. During the time that you saw Doctor Zisow in January of '83, through May of '83, did you express to Doctor Zisow any dissatisfaction with Doctor Byrne?

A. I was a little disturbed that he did not do anything at that time for me, and that he was so in a hurry for me to go in the hospital. His words were "If it was his wife, he would have me in the hospital tomorrow," and he was so eager for me to get in there, but he didn't do anything for me.

(Navin deposition at 106–07.)

Finally, in response to another question, plaintiff testified:

Q. Has any doctor told you that if Doctor Byrne had done things differently that chances are that you would have lost only one at most tubes?

A. Not in those specific words, but Doctor Zisow again could not understand why something wasn't done when he had me opened up the first time.

Q. When did Doctor Zisow express that to you?

A. I believe it was the second visit [February 14, 1983] when he had all the reports in front of him.

(Navin deposition at 116) (brackets added).

The above testimony abundantly satisfies the discovery rule standard. By at least April of 1983, plaintiff knew of her injury, the inflammation of her reproductive organs, the operative cause of her injury, Dr. Byrne's treatment, and the causative relationship between the injury and the operative conduct, the inflammation and resulting reduction in her fertility resulted from defendant's treatment.

This action is similar to *DeMartino v. Albert Einstein Medical Center*, 313 Pa. Super. 492, 460 A.2d 295 (1983). In *DeMartino*, plaintiff began a course of dental treatment in October of 1973 with the defendant's dentists. The treatments were

originally supposed to last only one and a half years but plaintiff was still being seen after three and a half years. At that time, in May of 1977, a specialist to whom plaintiff had been referred, told plaintiff whoever had been doing his dental work "could not have been watching what he was doing." *Id.* at 496, 460 A.2d at 297. On September 10, 1979, some twenty-eight months after this conversation, plaintiff filed suit. using the above-quoted discovery rule, the Superior Court held that plaintiff's claim was time-barred:

> When Dr. Brothman told him of the gum perforation and the bone erosion, he then had knowledge of his injury, though at that particular moment the knowledge of the cause of the injury still eluded him. However, when Dr. Brothman responded to appellant's direct query as to the cause, saying someone must not have been watching what he was doing, the appellant was then cognitive of the operative cause and the relationship between the cause and the injury. While it may be true that, due to Dr. Brothman's later reluctance to discuss the matter appellant could not be *positive* of what had occurred, he was no longer oblivious to the possibility that there may be more to his persistent problems than a natural progression of his disease. He had sufficient empirical information at his disposal to begin an investigation into suspicions which should reasonably have arisen out of Dr. Brothman's observations.

*Id.* at 508–09, 460 A.2d at 303 (footnote omitted) (emphasis in original).

Similarly, in the instant case, plaintiff had been placed on notice by another physician of the operative relationship between her injury and Dr. Byrne's conduct more than two years before she filed suit. Plaintiff testified that on February 14, 1983, Dr. Zisow questioned why defendant had not done anything when he performed the first laparotomy. (Navin deposition at 90–91, 116). After the second laparotomy Dr. Zisow told her there were bad doctors and good doctors. (*Id.* at 103). Moreover, during Dr. Zisow's treatment of her during this time plaintiff herself had felt concern about defendant's care. In April of 1983, after plaintiff had the second operation resulting in the loss of her tubes and ovary, plaintiff felt that Dr. Byrne should have taken action instead of just opening her up and then closing her, and, in plaintiff's view, simply stirring up the infection. (*Id.* at 104). In accord with *DeMartino*, these facts establish that the statute of limitations began to run from at least April of 1983 because plaintiff was aware at that time that medical treatment was causing her personal injury. *See DeMartino, supra,* 313 Pa.Super. at 502, 460 A.2d at 300. It follows then that plaintiff's lawsuit, filed on August 6, 1985, approximately three months after the deadline imposed by the statute, is time barred.

Plaintiff asserts that the period between April and August of 1983 should not count toward the running of the statute. A young woman placed in plaintiff's position would need this amount of time to establish a causative relationship between her injury and Dr. Bryne's treatment. But plaintiff's own testimony establishes otherwise. She realized in April of 1983 that Dr. Byrne may not have provided proper care. It is from that time that plaintiff was required to begin doing those things, among others, for which the statute of limitations specifically provides time—an opportunity to select and consult with a lawyer, investigation of her potential claim and initiation of suit. *See DeMartino, supra,* 313 Pa.Super. 502, 460 A.2d at 300. Plaintiff implies that she is entitled to a liberal construction of the limitations period in the instant case because of the nature and severity of her injury. Unfortunately, while we sympathize with plaintiff, we are aware of no authority which takes into account the nature of a plaintiff's injuries in determining when a claim is time barred.

Plaintiff next contends that defendant withheld information from her concerning her treatment and that the limitations period should be tolled while Dr. Byrne enjoyed the trust she naturally placed in their relationship. This argument ignores plaintiff's

subsequent care under Dr. Zisow and that the statute began to run, and thereafter expired, long after plaintiff stopped seeing Dr. Byrne. In any event, plaintiff had her suspicions of Dr. Byrne even while she was under his care. (Navin deposition at 51).

Pennsylvania courts have always emphasized the importance of a plaintiff's actively protecting her rights. "We must insist that those who assert claims of negligence be vigilant in bringing actions based thereon. The statute of limitations demands nothing less." *Held v. Neft, supra*, 352 Pa.Super. at ——, 507 A.2d at 843. *See also DeMartino, supra*, and cases cited therein. We must conclude that the plaintiff's cause of action is time-barred.

■ In doing so, we also conclude that this lawsuit is not saved by the additions of a contract claim in count III of the amended complaint.

A doctor and patient may, if they choose to do so, contract that a course of treatment will produce a specific result. If that result is not achieved, the patient may then have an action for breach of contract even though the doctor has exercised the highest degree of professional care. See: *Mason v. Western Pennsylvania Hospital*, 499 Pa. 484, 486, 453 A.2d 974, 975 (1982). See also: *Colvin v. Smith*, 276 A.D. 9, 92 N.Y.S.2d 794 (1949); 61 Am.Jur.2d, Physicians & Surgeons § 161 (1981).

An action for breach of contract must be commenced within six years. Such an action is not controlled by the two year statute of limitations which is applicable to actions for professional negligence causing injury to another's person. It has been held, however, that the two year statute applicable to causes of action for personal injuries cannot be avoided by the expedient of pleading in contract. *Jones v. Boggs & Buhl, Inc.*, 355 Pa. 242, 49 A.2d 379 (1946). See also: *Staiano v. Johns Manville Corp.*, 304 Pa.Super. 280, 450 A.2d 681 (1982); *Sha-*

*dle v. Pearce*, 287 Pa.Super. 436, 430 A.2d 683 (1981). In determining which statute will control, it is necessary to determine the nature of the damages sought to be recovered. If recovery is sought for the cost of completing performance of the contract or remedying defects in performance, the applicable statute of limitations is six years. See: *Jones v. Boggs & Buhl, Inc., supra*. See also: *Colvin v. Smith, supra*. If, however, the damages sought to be recovered are for personal injuries, the two year period of limitation is clearly applicable. *Jones v. Boggs & Buhl, Inc., supra*. See: *Staiano v. Johns Manville Corp., supra; Shadle v. Pearce, supra; Sykes v. Southeastern Pennsylvania Transportation Authority*, 225 Pa.Super. 69, 310 A.2d 277 (1973). It is applicable whether the pleaded cause of action sounds in contract or in tort.

*Murray v. University of Pennsylvania Hospital*, 340 Pa.Super. 401, 405–406, 490 A.2d 839, 841–842 (1985) (footnotes omitted).[2]

In the instant case the contract count incorporates by reference all of the paragraphs of the preceding two counts which are based on negligence. Those paragraphs include typical claims for personal injury, including mental suffering. (Amended complaint, ¶ 17). In addition, count III alleges that the parties entered into a contract "for professional medical treatment," (*id.* at ¶ 25), and that defendant breached a duty under the terms of the contract "to render professional medical treatment ... within the standards of care of a physician of his expertise." (*Id.* ¶¶ 26, 27). As a result, plaintiff claims she "was damaged." (*Id.* ¶ 28). This is not a claim that defendant failed to provide a promised, specific result. Rather, it is a claim for personal injuries pleaded in contract. Hence, the two year limitations period for bodily injury actions applies to count III and this claim must be dismissed as well.[3]

---

2. The six year statute of limitations for contract actions is found at 42 Pa.C.S. § 5527(2).

3. Plaintiff asserts that the contract claim should not be dismissed since she alleges, referring to the operating plan for the first laparotomy, de-

fendant agreed to remove a mass from the area of plaintiff's ovaries, which he failed to do entirely. We must reject this argument. Plaintiff did not plead this claim and it is clear that the parties never contracturally agreed for removal of the mass. Removal was only the means by which defendant was to meet his duty of care to plaintiff.