516 A.2d 53

**Mary Ann GROOVER and August T. Groover, Appellants,**

v.

**RIDDLE MEMORIAL HOSPITAL and Dr. Robert C. Lecher, Appellees.**

Superior Court of Pennsylvania.

Argued May 15, 1986.

Filed Oct. 9, 1986.

Joseph McFadden, Media, for appellants.

Malcolm L. Lazin, Philadelphia, for appellees.

Before CAVANAUGH, WICKERSHAM and ROBERTS, JJ.

CAVANAUGH, Judge:

Mary Ann Groover and her husband, August T. Groover, appeal from an order of the Court of Common Pleas of Delaware County entered on September 20, 1985 which granted the defendants' motion for summary judgment. We affirm.

Sometime between March 25 and April 3, 1979 while appellant Mary Ann Groover was a patient at the Riddle Memorial Hospital, she received a very painful injection. From the time of the injection, appellant began to suffer pain and loss of control in her right leg.[1] Appellant saw various doctors over the next several years in an attempt to ascertain the problem with her leg. In June of 1983, Dr. Pierre LeRoy determined that the pain in her right leg was a sciatic nerve injury and linked it to the injection she received while in the hospital. Appellants filed suit against appellee on September 3, 1983. Appellees contend that the lower court did not abuse its discretion in granting the motion for summary judgment because suit was filed beyond the two year statute of limitations period. Appellants argue that because of the "discovery rule", the statute did not begin to run until June of 1983 when Dr. LeRoy informed appellant of the type of injury she suffered and its cause, and therefore the suit was timely filed. We agree with the appellee and affirm the lower court's order granting the motion for summary judgment.

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pa.R.C.P. 1035(b).

In addition, we are mindful that in considering a motion for summary judgment the court must examine the

---

**1.** In answer to an interrogatory, appellant referred to more than one injection given to her from March 25 to April 3, 1979 as causing her injury. On appeal, she focuses on the one, painful, injection as the cause.

record in the light most favorable to the non-moving party; that the court's function is not to decide issues of fact but merely to determine whether any such issues exist; and that all doubts as to the existence of a genuine issue of material fact must be resolved in favor of the nonmoving party.... We also note that 'ordinarily most questions relating to the applicability of the defense of the statute of limitations are questions of fact to be determined by the jury'.... Specifically, the question of whether a plaintiff has exercised due diligence in discovering the incidence of his injury is usually a jury question.... 'Whether the statute has run on a claim is usually a question of law for the judge....' This is not to say that there are not instances where summary judgment may be ordered in malpractice actions based upon a statute of limitations defense. Entry of summary judgment is proper where the plaintiff fails to plead facts sufficient to toll the statute, ... or admits facts sufficient to admit the limitations defense.... or fails in his response, by affidavits, or as otherwise provided, to set forth facts showing that there is a genuine issue for trial, Pa.R.C.P. No. 1035(d), or where the evidence relied upon by the plaintiff is inherently incredible....

*Taylor v. Tukanowicz,* 290 Pa.Super. 581, 435 A.2d 181 (1981) (citation omitted).

*Cathcart v. Keene Indus. Insulation,* 324 Pa.Super. 123, 135–37, 471 A.2d 493, 500 (1984) discussed the "discovery rule", which serves to ameliorate the harsh effects of the statute of limitations.

Pennsylvania's statute of limitations for personal injury cases is two years. Evidently in an effort to ameliorate the sometimes-harsh effects of the statute, Pennsylvania courts have adopted what has come to be known as the "discovery rule." Where this rule is applied, the statute of limitations will not begin to run until the plaintiff has discovered his injury, or, in the exercise of reasonable diligence, should have discovered his injury.... The discovery rule was recently applied by a panel of our

Court in *Staiano v. Johns-Manville Corp.*, 304 Pa.Super. 280, 450 A.2d 681 (1982). In *Staiano*, the panel approved a variation of the discovery rule which was articulated in *Volpe v. Johns-Manville Corp.*, 4 Phila. County Reporter 290. Under this "Volpe test," three independent phases of knowledge must be known or knowable to a plaintiff before the statute of limitations begins to run: (1) knowledge of the injury, (2) knowledge of the operative cause of the injury, and (3) knowledge of the causative relationship between the injury and the operative conduct. Although the Volpe test has a nice "ring" to it, it unnecessarily complicates the question of when the statute begins to run. For instance, what does "operative" in "operative cause" mean, and can it be possible for a plaintiff to know the "operative cause" of his injury yet not know the relationship between the "operative conduct" and the injury? The discovery rule has been stated in an understandable manner by our Supreme Court, and we see no reason to complicate the law by adopting a modified version of the rule for cases involving diseases contracted from exposure to hazardous substances. We find that the statute of limitations begins to run in "creeping disease" cases when the plaintiff knows, or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct. Stating the test in this manner will result in conformity with various other jurisdictions which have addressed this same problem.

(Footnotes omitted.)

We agree with *Cathcart's* analysis and believe that its rational simplification of the *Volpe* test commends its adoption in all "discovery rule" cases, not just "creeping disease" cases. Under the facts of this case, the end result achieved by both tests would be the same, but the use of the *Cathcart* test would allow for more understandable analysis. However, because the *Cathcart* test has not as yet been applied to medical malpractice cases, we will not

go so far as to hold that the two are interchangeable in *all* cases.

In the instant case, we find as a matter of law that in the spring of 1979 appellant knew or reasonably should have known 1) that she was injured, and 2) the operative cause of her injury, and 3) the causative relationship between the injury and the operative conduct.

That appellant knew that she was injured in the spring of 1979 is evidenced by her answers to two interrogatories:

2. If you claim a permanent injury resulting from the treatment, surgery or examination upon which this action is based, describe such injury fully and in detail.

*ANSWER:* The Plaintiff suffers permanent sciatic neuritis, right, neuropathy right L5–S1 and reflex sympathetic distrophy.

The Plaintiff suffers permanent and constant pain shooting downwards from her right hip through the back of her right leg to the outside of her right calf and into her foot. Depending upon her physical exertion, said pain can turn into a severe, hot burning sensation and a severe charley horse type cramping. This severity of pain occurs to the Plaintiff anywhere from a daily basis to a couple of times a week. Also, depending upon her activity, the Plaintiff's right leg gives away from underneath her approximately once a week which at times will cause her to injure another part of her body upon falling. Plaintiff also suffers emotional distress and anxiety due to the inconsistent and unannounced pain or loss of control of her right leg. She experiences this permanent feeling of instability which has severely limited her activities and family responsibilities.

In interrogatory 18, appellant was asked to state the specific facts upon which she based each claim of negligence or malpractice alleged in this action. She answered:

The Plaintiff repeatedly received improper and careless mechanical injections ... following her surgery of 3/25/79. The plaintiff experienced severe pain and de-

manded that said injections be discontinued. *All injuries described in interrogatory # 2 began at the time of said injections.* The Plaintiff never experienced these symptoms prior to the injections.

(Emphasis added.)

In answers at her deposition, appellant further indicated that she knew she was injured by the spring of 1979.

Q. As I understand your testimony, you had an injection that was of some excruciating pain to you, causing a sensation down your leg. The very same day, you complained about that injection to your attending physician. You instructed the next nurse that you saw that you would have no more injections in the hospital.

A. Uh-huh.

Q. Did you at any time between that date on which that injection occurred and your visit to Dr. DiStefano ever say to yourself, "I wonder whether the problem that I'm experiencing in my right leg resulted from the injection that I received in the hospital that was so excruciatingly painful"?

A. I probably did, because I could feel the spot back here and I kept asking—I can remember asking Gus to look to see if there was anything there.

. . . .

Q. When you're referring in your answer to that spot, can I assume that you meant by that spot, the spot where you were injected?

A. I never said to myself—

Q. Please just answer my question.

A. All right. That spot.

Q. You're referring to the spot where you were injected?

A. Right, but I wasn't able to say to me, okay, look, this is what it is and this is why it is. I never said that to me, because I didn't know. I really didn't know.

Q. When you went to see these various Doctors over the course of the two years leading up to your ultimate exami-

nation by Dr. DiStefano, did you tell these Doctors about the injection?

A. I told them that it started to hurt here, and I'm pointing to that spot where I got the injection, and where it radiated from that point. I told them—then they would ask questions and in the course of my answers, the fact that I received an injection would come out.

Furthermore, appellant knew or reasonably should have known in the spring of 1979 that her injury was *caused by the conduct of another*, (that is, she knew the "operative cause"). In her answer to interrogatory number 18 (set forth in pertinent part, *supra*), appellant stated that her injuries began at the time of the injections during her stay in the hospital from March 25 to April 3, 1979. The lower court opinion sets forth the following details about the painful injection appellant received.

"Mrs. Groover's memory of the particular injection is vivid and explicit. She described it as follows:

I received an injection into the right buttock that was so painful, I felt it all the way down to my right foot. It felt like someone had taken a hot needle or branding iron or something and rammed it down the length of me from the site of the injection into my right foot. I remember breaking out in a sweat, turning cold and feeling nauseated at the same time.

Mrs. Groover goes on to state that she 'never experienced anything like that in [her] entire life.'.... Immediately thereafter, Mrs. Groover began to complain to, and seek advice from, the medical personnel around her regarding the injection. Immediately after receiving the injection, Mrs. Groover told the administering nurse 'No more injections. It's too painful. No more injections. And [she] refused any further injections after that.'.... Mrs. Groover also explained to other nurses and the attending physician that she wanted no more injections because they were too painful.... Since receiving the shot, Mrs. Groover claims she has been in constant pain."

The facts in this case clearly indicate that in the spring of 1979 appellant either knew or reasonably *should* have known that the injection, administered at the appellee hospital, was the cause of her injury.

Therefore, since the two year statute of limitations began to run in the spring of 1979, and appellants did not file suit until September, 1983, appellant's claim is barred.

■ Appellant maintains that the discovery rule delayed the running of the statute. She argues that from the time she received the painful injection in the spring of 1979 until June of 1983, she continuously sought help concerning the pain in her right leg, and that she attempted to determine the type of injury she suffered and the cause of that injury. She contends that she saw numerous doctors who did not know what was wrong with her leg.

Appellant need not have known the precise medical cause of the injury in order to commence the running of the statute of limitations. She need only to have known was that she was *injured.* "An injury is done when the act heralding a possible tort inflicts a damage which is physically objective and ascertainable." *Ayers v. Morgan,* 397 Pa. 282, 290, 154 A.2d 788, 792 (1959). The act which heralded a possible tort in this case was the painful injection administered to appellant in the spring of 1979. The physically objective and ascertainable damage inflicted by the injection was the pain and loss of control of appellant's right leg. We recently wrote in *Held v. Neft,* 352 Pa.Super. 195, 507 A.2d 839 (1986) that: "A lay person is not reasonably expected to know the precise medical cause of such an injury even though he knows that the injury was occasioned by a discrete medical procedure." 352 Pa.Superior Ct. at 200, 507 A.2d at 841.

Appellant alleges that the physicians with whom she consulted told her that they did not know what the problem was. Reading appellant's allegations in a common sense fashion, we believe that appellant knew or reasonably should have known that the cause of her problem was the painful injection and sought relief from various physicians

in an effort to alleviate the pain. The statements by the physicians should *not* be read to mean that they did not know, or suspect that the *injection* caused the injury. Rather, common sense suggests that the statements should be read to mean that the physicians were not medically certain as to the precise medical reason that the injection triggered the problems, and that they were unsure as to how they should be treated. Appellant stated in her deposition that she told the physicians with whom she consulted about the injection. "I told them that it started to hurt here, and I'm pointing to that spot where I got the injection, and where it radiated from that point."

In her counter-affidavit to appellee's motion for summary judgment, appellant alleged that all of the doctors she saw did not know the cause of her injury until one doctor, in December of 1982, began to suspect that the cause may be related to the injections. This does not alter our holding. From the facts related, *supra*, at the very least, appellant reasonably should have known that her problems were caused by the injection. One need only know (or reasonably should know) that he is injured and that the injury was caused by the conduct of another. *See Cathcart, supra.* As to the second prong of the *Cathcart* test, it is only essential that the injured party know or reasonably should know that the conduct of another has caused the injury. It is not necessary that he know, or reasonably should know, that the conduct of another was *negligent. DeMartino v. Albert Einstein Medical Ctr. N.D.,* 313 Pa.Super. 492, 460 A.2d 295 (1983).

In *DeMartino,* we summed up the principles governing this area of the law.

Thus, once the patient is aware or should reasonably have become aware that medical treatment is causing him personal injury the statute begins and the prospective plaintiff is required to begin doing those things for which the statute of limitations specifically provides time: "an opportunity to select and consult with a lawyer, investigation, initiation of suit, discovery, joinder of additional

parties, etc." *Keating v. Zemel,* 281 Pa.Superior Ct. 129, 134 n. 4, 421 A.2d 1181, 1184 n. 4 (1980). It is during this two year period that the medical malpractice plaintiff, like any other plaintiff pursuing any other legal claim, makes the decision whether or not to pursue any legal rights he may possess.

*Id.,* 313 Pa.Superior Ct. at 502, 460 A.2d at 300.

The law allowed the appellant two full years from the spring of 1979 to investigate and bring an action. More than four years passed before suit was filed. We must insist that those who assert claims of negligence be vigilant in bringing legal action based thereon. The statute of limitations demands nothing less.

As our Supreme Court has stated:

"The 'discovery rule' ... arises from the *inability of the injured, despite the exercise of due diligence,* to know of the injury or its cause.... [I]n a case of medical malpractice involving the failure of a surgeon to remove an implement of surgery, it is the inability of the plaintiff to ascertain the presence of the offending implement which prevents the commencement of the running of the statute, for '[c]ertainly he could not open his abdomen like a door and look in; certainly he would need to have medical advice and counsel.' *Ayers v. Morgan,* 397 Pa. 282, 289, 154 A.2d 788, 792 (1959). The salient point giving rise to the equitable application of the exception of the discovery rule is the inability, despite the exercise of diligence by the plaintiff, to know of the injury."

*Pocono Intern. Raceway v. Pocono Produce,* 503 Pa. 80, 85, 468 A.2d 468, 471 (1983). "[E]ven though a person may not discover his injury until it is too late to take advantage of the appropriate remedy, this is incident to a law arbitrarily making legal remedies contingent on mere lapse of time." *Id.*

In the instant case while appellant may be said to have exercised diligence in seeking medical care, she did not

exercise diligence in seeking legal relief. The two are not synonymous.[2]

We hold that because appellant here has not exercised sufficient vigilance in asserting her claim, her claim is necessarily barred.

Judgment affirmed.

2. While the *Volpe* test has a third prong to it, we need not delve into an analysis of it because it adds nothing to the first two tests we have already discussed. Under the facts of this case, the *Volpe* and *Cathcart* tests are interchangeable and would lead to identical results. It will be left to future panels to decide if the two tests are interchangeable in all cases.