658 A.2d 423

**Denise M. BIGANSKY, Appellant,**

**v.**

**THOMAS JEFFERSON UNIVERSITY HOSPITAL and Harvey Wank, D.D.S.**

Superior Court of Pennsylvania.

Argued Feb. 9, 1995.

Filed May 15, 1995.

70

72

Robert S. Lucarini, Philadelphia, for appellant.

Barbara S. Magen, Philadelphia, for Wank, appellee.

Before CIRILLO, OLSZEWSKI and HESTER, JJ.

CIRILLO, Judge:

Denise M. Bigansky appeals from an order entered in the Court of Common Pleas of Bucks County granting summary judgment in favor of Harvey Wank, D.D.S. We affirm.

Denise Bigansky commenced this cause of action against defendants Harvey Wank, D.D.S., and Thomas Jefferson University Hospital ("Jefferson Hospital"), following a surgical procedure performed by Dr. Wank at Jefferson Hospital on May 11, 1988. On that date, Dr. Wank operated to correct Bigansky's jaw since she suffered from internal derangement of the right and left temporomandibular joint, commonly referred to as "TMJ."

Bigansky alleges that Dr. Wank inserted proplast implants into her jaw during the surgery and that, on May 11, 1988, or shortly thereafter, the defective implants began to malfunction, causing intense and severe pain. At the conclusion of the discovery process, Dr. Wank filed a motion for summary judgment. Dr. Wank maintained that he was entitled to summary judgment since Bigansky's cause of action was time-barred by the applicable statute of limitations, and since she presented no actionable theory of liability against him. The trial court granted Dr. Wank's motion for summary judgment and Bigansky timely appealed.[1] Bigansky raises one issue for this court's consideration: whether the trial court erred in granting summary judgment in favor of Dr. Wank?

When we review the grant of a motion for summary judgment according to Pennsylvania Rule of Civil Procedure 1035(b), our scope of review is well-settled: summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pa.R.C.P. 1035(b). Summary judgment may be granted only in those cases where the right

1. Co-defendant Jefferson Hospital had been previously dismissed from the case, thus making the order granting summary judgment in favor of Dr. Wank final and appealable. *See* Pa.R.A.P. 341(b).

is clear and free from doubt. *Musser v. Vilsmeier Auction Co. Inc.*, 522 Pa. 367, 369, 562 A.2d 279, 280 (1989); *Stephenson v. Greenberg*, 421 Pa.Super. 1, 617 A.2d 364 (1992), *appeal denied*, 535 Pa. 649, 633 A.2d 153 (1993). The moving party has the burden of proving that there is no genuine issue of material fact. *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466 (1979). Moreover, the record and any inferences therefrom must be viewed in the light most favorable to the nonmoving party, and any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Davis v. Pennzoil*, 438 Pa. 194, 264 A.2d 597 (1970); *Stephenson, supra*, 421 Pa.Super. 1, 617 A.2d 364. Finally, the trial court will be overturned on the entry of summary judgment only if there has been an error of law or a clear abuse of discretion. *Hetrick v. Apollo Gas Co.*, 415 Pa.Super. 189, 608 A.2d 1074 (1992).

The trial court granted Dr. Wank's motion for summary judgment because it found that Bigansky did not successfully toll the applicable statute of limitations. Thus, we must determine whether the trial court erred or abused its discretion in reaching that decision. *Hetrick, supra.*

Bigansky alleges that on May 11, 1988, Dr. Wank operated on her jaw and on the same day, or shortly thereafter, she began to experience severe pain due to the malfunction of defective implants. Bigansky filed a complaint against Dr. Wank which included an action in negligence as well as an action based upon strict liability under § 402A of the Restatement (Second) of Torts. Bigansky's count in strict liability pursuant to § 402A of the Restatement (Second) of Torts is not properly before this court.

■ With respect to Bigansky's negligence claim, the action is controlled by a two year statute of limitations. Pennsylvania's statute of limitations for personal injuries requires that an action to recover damages for injuries resulting from the wrongful act or negligence of another must be commenced within two years. 42 Pa.C.S.A. § 5524. Pennsylvania Rule of Civil Procedure 1007 provides that an action may be com-

menced by filing with the prothonotary either (1) a praecipe for a writ of summons, or (2) a complaint. Pa.R.C.P. 1007.

Just prior to the expiration of the two-year statute of limitation, Bigansky filed a praecipe for a writ of summons *pro se* on May 7, 1990. Pennsylvania Rule of Civil Procedure 401(a) requires original process to be served within the Commonwealth within thirty days after the issuance of the writ or the filing of the complaint. Pa.R.C.P. 401(a). Instantly, the May 7, 1990 writ was not served on Dr. Wank within the thirty days required by Rule 401(a). Dr. Wank contends that the statute of limitations began to run on May 11, 1988. Dr. Wank further asserts that Bigansky's failure to serve the writ within thirty days of the May 7, 1990 date, when the writ was issued, results in the bar of Bigansky's claims against him.

Bigansky argues that the cause of action did not arise, according to the discovery rule, until after a subsequent operation was performed on April 24, 1990 by Larry M. Wolford, D.D.S., in Texas, when she was allegedly informed and, hence, discovered, that proplast implants were used in the original operation by Dr. Wank. Further, Bigansky argues that even if the statute of limitations did begin to run on May 11, 1988, she still timely tolled the statute by filing the writ on May 7, 1990 and by subsequently filing a praecipe to reissue the writ on April 24, 1992 and again on September 16, 1992. Pennsylvania Rule of Civil Procedure 401(b) provides that:

(1) If service within this Commonwealth is not made within the time prescribed by subdivision (a) of this rule . . ., the prothonotary upon praecipe and upon presentation of the original process, shall continue its validity by reissuing the writ. . . .

(2) A writ may be reissued . . . at any time and any number of times.

(4) A reissued . . . writ . . . shall be served within the applicable time prescribed by subdivision (a) of this rule[, thirty days,] . . . after reissuance.

Pa.R.C.P. 401(b). Service of the writ was effectuated on Dr. Wank on September 22, 1992.

In order to determine whether the trial court properly granted Dr. Wank's motion for summary judgment, we must first ascertain when the applicable statute of limitations began to run. The general rule is that the statute of limitations begins to run when the negligent act has been done. *Moore v. McComsey*, 313 Pa.Super. 264, 270, 459 A.2d 841, 844 (1983). In this Commonwealth, the statute of limitations for a negligence cause of action is triggered upon the occurrence of the alleged breach of duty. *School Dist. of the Borough of Aliquippa v. Maryland Casualty Co.*, 402 Pa.Super. 569, 580, 587 A.2d 765, 770 (1991).

"The purpose of a statute of limitations is to expedite litigation and to discourage stale claims." *Moore*, 313 Pa.Super. at 270, 459 A.2d at 844. Moreover, a party who raises a claim against another has a duty to exercise all reasonable diligence to inform himself of the facts and to bring the suit within the prescribed period. *Id.* Also, mere mistake, misunderstanding or lack of knowledge is not sufficient to toll the running of the applicable statutory period. *Id.*

If the general rule is applied to the facts of this case, then the statute of limitations began to run on May 11, 1988, the day of the surgery, when the alleged negligent act had been done or, in other words, when the duty was breached. *Moore, supra*, 313 Pa.Super. 264, 459 A.2d 841; *Maryland Casualty, supra*, 402 Pa.Super. 569, 587 A.2d 765. Thus, under the general rule, Bigansky properly tolled the statute on May 7, 1990 by filing the praecipe to issue the writ within two years of May 11, 1988. We must nevertheless examine Bigansky's conduct after she filed the writ in order to determine whether she engaged in a course of conduct which stalled the legal process. Also, if the discovery rule were to apply so as to push the statute of limitations date to May 7, 1990, when Bigansky allegedly discovered the use of proplast implants by Dr. Wank, then we must still examine Bigansky's conduct subsequent to the filing of the writ, for the same reasons as under the general rule.

With regard to the discovery rule, courts distinguish between those general cases where the statute begins to run when the negligent act has occurred, and the discovery rule, where the injured party could not have immediately discovered the injury and, thus, the negligent act. We have held:

> The only exception to this general rule is where the existence of an injury is not known to the complaining party and such knowledge cannot be reasonably ascertained within the prescribed statutory period. In such cases, the prescribed statutory period does not begin to run until discovery of the injury is reasonably possible. To come within this exception, it [is] essential that [the party] ha[s] made reasonable efforts to protect his interests and explain why he was unable to discover promptly the operative facts necessary to plead his cause of action.

*Moore,* 313 Pa.Super. at 271, 459 A.2d at 845 (citations omitted). This exception to the general rule, otherwise known as the discovery rule, has been expounded upon as it relates to actions for medical malpractice:

> An exception to this [two year statute of] limitation[s] has been articulated by our courts in medical malpractice cases where very often the patient (and prospective plaintiff) has no reason to believe that he has suffered an injury caused by the administration of a physician's treatment. The 'discovery rule' concept is premised on the concept that where the existence of an injury cannot be reasonably ascertained, the statute of limitations does not begin to run until such time as the injury's existence is known or discovered, or becomes knowable or discoverable by the exercise of reasonable diligence.

*Held v. Neft,* 352 Pa.Super. 195, 199, 507 A.2d 839, 841 (1986) (quotations omitted). The case where the discovery rule was first implemented is *Ayers v. Morgan,* 397 Pa. 282, 154 A.2d 788 (1959), where the Supreme Court of Pennsylvania held that "an injury is done when the act heralding a possible tort inflicts a damage which is physically objective and ascertainable." *Ayers,* 397 Pa. at 290, 154 A.2d at 792. The application of the discovery rule is now delineated as follows:

"[T]he statute commences when the medical malpractice plaintiff has knowledge or (and this is crucial to the determination) through the exercise of reasonable diligence should have knowledge of: (1) his injury; (2) the operative cause of his injury; and, (3) the causative relationship between his injury and the operative conduct." Knowledge of the negligence is not part of the discovery rule.

*Held,* 352 Pa.Super. at 199–200, 507 A.2d at 841 (quoting *DeMartino v. Albert Einstein Medical Center, Northern Division,* 313 Pa.Super. 492, 500, 460 A.2d 295, 299 (1983)).

Concerning the application of the discovery rule, we have stated:

In applying the discovery rule, whether a plaintiff should have made a timely discovery of his or her injury is generally an issue for the jury unless the undisputed facts lead unerringly to the conclusion that the time it took to discover an injury was unreasonable as a matter of law. In such cases, summary judgment may be entered by the court.

*McDonald v. Rosen,* 423 Pa.Super. 304, 308, 621 A.2d 128, 130 (1993).

Bigansky asserts that, pursuant to the discovery rule, the statute of limitations did not begin to run until after the surgery performed by Dr. Wolford in May of 1990, when she allegedly discovered that proplast material had been used in the initial operation performed by Dr. Wank. Bigansky also submits that, even if the statute did begin to run for the negligence claim on the date of the initial operation, the discovery rule should be applied so as to push the starting date for the statutory period to May of 1990 for her separate products liability count. Finally, Bigansky argues that, even if the statute began to run for the entire action on May 11, 1988, the day of the operation, she did not engage in a course of conduct which served to stall the legal process as the trial court held.

In this case, Bigansky admitted, both in her complaint and in her deposition, that she experienced intense, severe and excruciating pain immediately following the surgery on May

11, 1988. Bigansky claims, however, that simply experiencing pain following a surgical procedure does not constitute notice of an injury or an understanding sufficient enough to establish knowledge that she was injured, what the operative cause of that injury might be, or what the causative relationship between the injury and the operative conduct could be. We agree that, generally, when an individual has undergone a surgical procedure and experiences pain immediately thereafter, the existence of such pain following the procedure would not tend to put that individual on immediate notice that they have been injured and that the physician's improper or negligent performance of the procedure was the cause of such injury. This typical situation, however, does not adequately describe the circumstances involved in the present case. The record in this case reveals that the circumstances following Bigansky's surgical procedure were sufficient to put Bigansky on notice that she suffered an injury as a result of the conduct of another. Bigansky testified at her deposition as follows:

Q. Do you know what your mother meant by "if Doctor Wank was having trouble could he have gotten help?"

A. Our impression was that there was some problem with the surgery from the start.

Q. How did you get that impression?

A. Well, first of all, the surgery lasted a lot longer than it was supposed to. It was more extensive than it was supposed to be.

Q. Do you know how long it was supposed to last?

A. I think it was only supposed to last roughly a couple hours.

Q. And how long did it last?

A. Probably somewhere like five, six hours plus a lot of time in recovery.

Q. Do you know why it lasted that long?

A. I imagine there was some sort of problem.

\* \* \* \* \* \*

Q. Can you tell me what symptoms you have that led you to believe that Proplast may have been used?

A. After Doctor Wank's surgery, the first thing that I noticed was it felt like someone had poured a bottle of acid inside my head and face. The pain was totally excruciating. My face stopped moving.

\* \* \* \* \* \*

A. I could only eat liquids. I had very bad pain in the sides of my neck leading down to my chest.

Q. Both sides of your neck?

A. Yes. And then over time my whole body has become involved.

Q. In what way?

A. There isn't—all my bones, my joints, my—all the tissues around them, they all are excruciatingly painful.

Q. When did you first notice the pain in your head and face?

A. From Doctor Wank? Immediately.

Q. Immediately after surgery?

A. Yes.

Q. When you became conscious?

A. Yes.

Q. While you were still in the hospital?

A. I felt the pain before I was conscious, in fact, while I was in the recovery room. I wasn't even around yet, and I was screaming and everything.

\* \* \* \* \* \*

Q. When did you first develop the pain in the sides of your neck and your chest going down to your chest?

A. Immediately after.

\* \* \* \* \* \*

Q. When did you notice that all of your joints hurt around the tissues around your joints?

A. Pretty quickly. But they have gotten progressively and progressively and progressively worse up until this time. There has been greater and greater involvement.

Q. When you say "pretty quickly," what do you mean? How soon did you first noticed [sic] it?

A. Several weeks. Even immediately after, but at that time I had basically been thinking it is pain from the surgery. It is going to go away.

Q. Okay. When you say "immediately," do you mean while you were still in the hospital?

A. Yes. In fact, I went to the emergency room the day I was released at Thomas Jefferson [Hospital].

(S.R. 44b, 45b, 62b–66b) (underlining supplied).

We generally agree with Bigansky's assertion that to experience pain following a surgical procedure is a common occurrence. We find, however, that the combination of factors in the present case negates a finding that Bigansky's severe and excruciating pain could reasonably be associated with normal post-operative pain. Bigansky knew or, through the exercise of reasonable diligence, should have known that she suffered an injury, what the operative cause of the injury could be, and the causative relationship between the injury and the operative conduct, for several reasons.

Bigansky admits that she, as well as her mother, believed immediately following the surgery that there was a problem with the actual surgery itself. Bigansky testified that the surgery lasted much longer than it supposedly should have lasted and Bigansky attributed the extended duration of the surgery to some "problem" with the surgery.[2] Also, Bigansky

---

2. What is more important than how long the surgery was supposed to last, or how long it actually did last, is what Bigansky actually believed. We must focus upon the plaintiff's interpretation of the facts surrounding a particular situation. Here, as far as Bigansky's testimony reflects, she knew in her mind that there was some "problem" with the surgery. The duration of the surgery, in and of itself, is not enough upon which to base a cause of action. We do not want to encourage the immediate filing of a lawsuit right after a surgical procedure simply because a person experiences pain. Undoubtedly, people will probably have to endure pain and discomfort following a surgical procedure. As a result, we wish to avoid, and do not want to encourage, the institution of totally precautionary, yet frivolous lawsuits. Indeed, such action would only tend to dissipate the physician-patient relationship by alienating the patient from his or her physician.

expressed her concern over the extensive time which she spent in the recovery room following the procedure.

Bigansky also admitted that she was in excruciating pain immediately following the surgery such that it felt as though someone had poured acid inside her head and face. The existence of such severe pain is emphasized all the more by the fact that this tremendous pain caused Bigansky to go to an emergency room the very day that she was released from Jefferson Hospital. While such excruciating pain may arguably be a common post-surgical experience for patients undergoing this type of surgery, or any other surgery for that matter, we find that such pain, in combination with the other pain which Bigansky experienced throughout the rest of her body, is not common in light of the fact that such additional "other-body" pain was not included in the consent form list of "Possible Operative And/Or Post–Operative Complications of Temporomandibular Joint Surgery," which was read and signed by Bigansky. Bigansky testified, as illustrated above, that immediately following the surgery, she experienced severe and intense pain in her chest area and in all her bones, joints and the surrounding tissues. None of these areas are listed or described in the signed consent form as areas which are potentially affected by possible operative or post-operative complications. This fact rebuts her claim that the *post*-operative pain which she experienced in certain areas of her body, i.e. her chest, all her bones, joints and surrounding tissues, could reasonably be interpreted as resulting from a typical operation to correct TMJ.[3]

Here, however, the extended duration of the surgery should have been Bigansky's first clue that something was not right. When this factor is added to the other factors discussed herein, then Bigansky knew, or should have known, that she was injured and that the injury was caused by the conduct of another.

3. Experiencing pain which may not have been included on the complications list does not necessarily provide a basis for a legal claim. It is only one of several factors which, as in this case, combine to provide knowledge of injury and its cause. What is critically important in this case is Bigansky's own belief that something was definitely wrong from the very beginning. Bigansky knew that she was injured and that her injury was caused by the conduct of another.

Additionally, Bigansky argues that although she felt excruciating pain immediately following the operation, she also claims to have felt severe pain prior to the operation. Bigansky argues, therefore, that the pain following surgery can be attributed to not only the common *post*-operative pain, which is normally associated with having undergone a surgical procedure, but can also be attributed to the *pre*-operative pain which resulted from her TMJ condition. As discussed, Bigansky experienced excruciating pain immediately following the surgery in areas of her body not contemplated by the possible operative and/or post-operative consent form discussed above. Further, that portion of Bigansky's claim that the excruciating post-operative pain can be attributed to her *pre*-operative TMJ condition is also refuted by the facts of record. Specifically, Bigansky testified that she had bad neck pain, back pain, left shoulder pain, and severe headaches, as well as some facial numbing and clicking, prior to the surgery. This list describing pre-operative areas of pain does not include Bigansky's post-operative pain which she experienced in the area of her chest, bones, joints and surrounding tissues. Thus, Bigansky experienced pain in new and different areas of her body after the surgery, which did not exist prior to the surgery, and which did not come within the list of possible operative and/or post-operative complications of TMJ surgery.

 Finally, Bigansky states in her complaint that "[o]n or about May 11, 1988 or shortly thereafter, the defective proplast implants began to malfunction causing intense and severe pain to plaintiff as well as other injuries described herein." At the very least, Bigansky reasonably should have known that her problems and pain were caused by the surgical

There may be situations, however, where the facts of the particular case clearly show that the pain or injury unquestionably should not follow from a particular procedure, regardless of the fact that it was not included on the complications list. For example, if a patient were to undergo an operation to have her appendix removed and came out of the procedure without her sight or hearing, then this alone would be sufficient to provide the patient with adequate notice that she has been injured and that the injury resulted from the contact of another. This may be an extreme example, but with such an example our point is made more clearly.

procedure on May 11, 1988. "One need only know (or reasonably should know) that she is injured and that the injury was caused by the conduct of another." *Groover v. Riddle Memorial Hospital,* 357 Pa.Super. 420, 429, 516 A.2d 53, 57 (1986), *appeal denied,* 515 Pa. 600, 528 A.2d 957 (1987). The admissions in Bigansky's complaint, in addition to her deposition testimony, clearly indicate that she knew that she was injured on May 11, 1988. Bigansky need not have known the precise medical cause of the injury in order to commence the running of the statute of limitations. *Groover, supra,* 357 Pa.Super. 420, 516 A.2d 53. She need only have known, or reasonably should have known, that she was injured. *Id.* "An injury is done when the act heralding a possible tort inflicts a damage which is physically objective and ascertainable." *Ayers,* 397 Pa. at 290, 154 A.2d at 792. The act which "heralded" a possible tort in this case was the surgical procedure which Bigansky underwent on May 11, 1988. The physically objective and ascertainable damage inflicted by the May 11th surgical procedure was the pain which Bigansky experienced in her chest, all her bones, joints and the surrounding tissues, as well as the excruciating pain in her head, face and neck.

"A lay person is not reasonably expected to know the precise medical cause of such an injury even though he knows that the injury was occasioned by a discrete medical procedure." *Held,* 352 Pa.Super. at 200, 507 A.2d at 841. On the other hand, "once the patient is aware or should reasonably have become aware that medical treatment is causing him personal injury the statute begins....." *Groover,* 357 Pa.Super. at 429, 516 A.2d at 57 (quoting *DeMartino v. Albert Einstein Medical Center N.D.,* 313 Pa.Super. 492, 502, 460 A.2d 295, 300 (1983)).

Furthermore, the record reflects that Bigansky knew, or reasonably should have known, on May 11, 1988 that her injury was caused by the conduct of another, that is, she knew what constituted the "operative conduct" under the second prong of the discovery rule. Bigansky testified that she had pain and that it must have resulted from the surgery because the surgery lasted much too long. Thus, Bigansky's own

impression was that there was some problem with the surgery. Bigansky was not required to know that her injury, which was caused by the conduct of another, was the result of negligence, since knowledge of negligence is not part of the discovery rule. *Held, supra,* 352 Pa.Super. 195, 507 A.2d 839.

Finally, Bigansky's testimony and admissions evidence the fact that she knew the causative relationship between her injury and the operative conduct. In other words, Bigansky knew that her injury, the excruciating pain which she was experiencing, resulted from the surgical procedure performed by Dr. Wank and that his or someone else's conduct caused the injury.[4]

These factors, when combined together, lead this court to the conclusion that Bigansky knew, or reasonably should have known, as early as May 11, 1988, that she was injured as a result of the surgical procedure and that it was caused by the conduct of another. Accordingly, under the discovery rule, just as under the general rule discussed above, the applicable statute of limitations began to run immediately following the surgery on May 11, 1988.[5]

■■■ We agree with the trial court's determination under the facts of this particular case that the applicable statute of limitations began to run immediately following the surgery, on the actual day of the surgery, May 11, 1988. We find, however, that this case is unique as to its particular facts and

4. There is some question as to whether this third prong of the discovery rule requires our review in this case as it has been held that requiring the plaintiff to know "the causative relationship between the injury and the operative conduct" adds nothing to the analysis of the first two prongs. *Groover, supra,* 357 Pa.Super. 420, 516 A.2d 53. Nonetheless, we believe that this third prong has been established according to the facts before us.

5. We are not inferring that since Bigansky knew, or reasonably should have known, that she had been injured and that it was caused by the conduct of another, that it necessarily follows that Dr. Wank was negligent. First, we have already pointed out that knowledge of negligence is not part of the discovery rule. Second, this analysis only pertains to the plaintiff's knowledge of her injury for purposes of triggering the statute of limitations. The inquiry does not stop. To the contrary, the plaintiff is required to perform discovery and go to trial to convince the factfinder that she did in fact suffer an injury, as well as all other elements of the cause of action.

that, in most typical situations involving the issue of post-operative pain and knowledge of injury, the applicable statute of limitations is more likely to start running within the weeks or months immediately following the procedure. "As each case has different circumstances, each must be evaluated in light of its own particular facts." *Stephenson, supra,* 421 Pa.Super. 1, 617 A.2d 364. The facts of the instant case, especially the plaintiff's own testimony and admissions, actually pinpoint the fact that she knew on May 11, 1988, that she was injured and that her injuries were caused by the conduct of another. The facts in this case are actually quite similar to those presented in *Groover, supra,* 357 Pa.Super. 420, 516 A.2d 53.

In *Groover,* a woman received a very painful injection while in the hospital sometime between March and April of 1979. The woman was in constant pain immediately following the injection, and she gradually lost muscular control of her leg. The medical cause of the woman's pain was not linked to the injection until June of 1983. The plaintiff argued that the discovery rule prevented the applicable statute from beginning to run until June of 1983 when she was informed of the type of injury she suffered and its cause. The court in *Groover* rejected the plaintiff's argument and held that the plaintiff knew or reasonably should have known in the spring of 1979 that she was injured, what constituted the operative cause of her injury, and the causal relationship between the injury and the operative conduct. *Groover, supra,* 357 Pa.Super. 420, 516 A.2d 53.

The plaintiff in *Groover* admitted in her answers to interrogatories that all of her injuries began at the time of the injections. The court concluded that the facts clearly showed that in the spring of 1979 the plaintiff knew or reasonably should have known that the injection was the cause of her injury. *Groover,* 357 Pa.Super. at 428, 516 A.2d at 56. Similarly, the facts in this case clearly show that Bigansky knew or reasonably should have known on May 11, 1988, that the surgical procedure was the cause of her injury.

Even under the typical situation mentioned above where the statute of limitations would begin to run within the weeks or months following the procedure, depending on the

facts of the situation and the circumstances surrounding each particular case, there is no question that the result in this case would nevertheless remain the same. In this case, within the month or two following the surgery, Bigansky most certainly would have known or, through the exercise of reasonable diligence, should have known, that she was injured and that her injuries were caused by the conduct of another. As discussed below, in either situation, the result would remain the same in light of Bigansky's actions following the filing of the writ.

Since the date for statute of limitations purposes was May 11, 1988, Bigansky was required to file either a praecipe to issue a writ or a complaint within two years of this date so as to toll the statute of limitations. Bigansky filed a writ on May 7, 1990. The important question is whether Bigansky's filing of the writ effectively tolled the statute. We find that although Bigansky's filing of the writ did toll the statute, we nevertheless agree with the trial court's conclusion that Bigansky engaged in a course of conduct that stalled the legal process.

The Pennsylvania Supreme Court in *Lamp v. Heyman*, 469 Pa. 465, 366 A.2d 882 (1976), addressed the issues of tolling the statute of limitations and reissuance of the writ of summons. In *Lamp*, the plaintiff allegedly sustained an injury on September 1, 1967. Subsequently, the plaintiff in *Lamp* filed a writ of summons on August 8, 1969, but instructed the prothonotary not to deliver the writ to the sheriff for service. The plaintiff then took no further action until April 9, 1970, when she reissued the writ. Again, no service was effectuated, although there existed no reasons on the record for the lack of service. The writ in *Lamp* was reissued a second time on June 6, 1970, and was finally served on June 19, 1970.

The Court in *Lamp* held that the mere filing of a praecipe for a writ of summons to commence an action is sufficient to toll the running of the applicable statute of limitations. *Lamp*, 469 Pa. at 471, 366 A.2d at 885. The Court also held that although the Pennsylvania Rules of Civil Procedure require a writ to be served within thirty days after the writ's

issuance, it may, pursuant to Rule 401(b)'s predecessor Pa. R.C.P. 1010, nevertheless be reissued at any time after the original issuance during a period equivalent to that permitted by the applicable statute of limitations for the commencement of the action. *Id.* The Court further held that each additional valid reissuance of the writ gives rise to a new equivalent period during which the writ may again be reissued. *Id.*

In the instant case, Bigansky filed the writ on May 7, 1990, which was within the two-year statute of limitations beginning on May 11, 1988. Thus, it is clear that Bigansky validly tolled the applicable statute of limitations by filing the writ of summons within two years of May 11, 1988. It is also clear that, in light of *Lamp* and its progeny, Bigansky was permitted to reissue the writ at any time after the original issuance during a period equivalent to that permitted by the applicable statute of limitations. In this case, when Bigansky reissued the writ on April 24, 1992, she did reissue the writ within the period equivalent to that permitted by the statute. In other words, Bigansky's filing of the writ on May 7, 1990 enabled her, pursuant to *Lamp* and Rule 401(b), to reissue the writ within an additional time period equivalent to that of the applicable statute of limitations, namely, two years. Accordingly, Bigansky's reissuance of the writ on April 24, 1992, and again on September 16, 1992, was valid. *Lamp, supra,* 469 Pa. 465, 366 A.2d 882; Pa.R.C.P. 401(b). As a result, Bigansky's service of the writ on September 22, 1992 was also valid as it was within thirty days of the reissuance of the writ on September 16th. *See* Pa.R.C.P. 401(b)(4).

The Court in *Lamp,* however, also set forth a caveat to be recognized with the reissuance of writs. The Court stated:

[W]e now conclude that *there is too much potential for abuse in a rule which permits a plaintiff to keep an action alive without proper notice to a defendant merely by filing a praecipe for a writ of summons and then having the writ reissued in a timely fashion without attempting to effectuate service.* In addition, we find that such a rule is inconsistent with the policy underlying statutes of limitation of avoiding stale claims, and with that underlying our court

rules of making the process of justice as speedy and efficient as possible.

*Lamp,* 469 Pa. at 477, 366 A.2d at 888–89 (footnotes omitted) (emphasis added).

It is true in this case that the above caveat does not apply precisely to the facts in this case for Bigansky did attempt to effectuate service after the May 7, 1990 issuance of the writ and after the April 24, 1990 reissuance of the writ. The Court, however, completed its pronouncement of this caveat by holding:

> Our purpose is to avoid the situation in which a plaintiff can bring an action, but, by not making a good-faith effort to notify a defendant, retain exclusive control over it for a period in excess of that permitted by the statute of limitations.... [A] writ of summons shall remain effective to commence an action only if the plaintiff then refrains from a course of conduct which serves to stall in its tracks the legal machinery he has just set in motion.

*Lamp,* 469 Pa. at 478, 366 A.2d at 889 (footnote omitted).

Engaging in a course of conduct which serves to stall the legal process has been interpreted by those cases which have followed *Lamp* and which have addressed this issue. Specifically, the Supreme Court's holding in *Lamp* has been interpreted as requiring a "good-faith effort" on the part of the plaintiff to notify the defendant. *Ferrara v. Hoover,* 431 Pa.Super. 407, 636 A.2d 1151 (1994); *Collins v. Greene County Memorial,* 419 Pa.Super. 519, 615 A.2d 760 (1992), *aff'd,* 536 Pa. 475, 640 A.2d 379 (1994). In addition, this court has held that the "failure to make a good faith effort to notify the defendant will serve to nullify both the commencement of the action and the tolling of [the] statute of limitations." *Ferrara,* 431 Pa.Super. at 410, 636 A.2d at 1152 (quoting *Collins,* 419 Pa.Super. at 525, 615 A.2d at 762). To refrain from a course of conduct that serves to stall in its tracks the legal machinery that a plaintiff has just put into motion requires that plaintiff "act in good faith and in a manner that will prevent delay." *Rosenberg v. Nicholson,* 408 Pa.Super. 502, 507, 597 A.2d 145,

147 (1991), *appeal denied*, 530 Pa. 633, 606 A.2d 903 (1992). Moreover, although there is no mechanical approach to be applied in determining what constitutes a good faith effort, it is the plaintiff's burden to demonstrate that his efforts were reasonable. *Cahill v. Schults*, 434 Pa.Super. 332, 337, 643 A.2d 121, 123 (1994); *accord Green v. Vinglas*, 431 Pa.Super. 58, 635 A.2d 1070 (1993).

We believe that the rule requiring a good faith effort on the part of the plaintiff to serve the defendant so as to provide the defendant with notice of the action and to prevent delay, as established in *Lamp* and subsequently interpreted by this court, was designed to prevent the situation presently illustrated by the facts of this case. In *Lamp*, the Court found that the procedural facts surrounding the filing of the writ, the writ's reissuance, and the ultimate service of the writ upon the defendant did not show that the plaintiff engaged in a course of conduct which served to stall the legal machinery which he set in motion. The facts in *Lamp*, though, are distinguishable from the facts in the present case.

In *Lamp*, the plaintiff served the writ within ten months of the original filing of the writ. In this case, on the other hand, Bigansky served the writ upon Dr. Wank twenty-eight months after the original filing of the writ, almost three times longer than the period of delay in *Lamp*. Bigansky did attempt to serve the writ within the thirty days following the original issuance of the writ on May 7, 1990. Bigansky also attempted to serve the writ within the thirty days following the reissuance of the writ on April 24, 1992. Even if we were to assume that these attempts by Bigansky did constitute a good faith effort, Bigansky still made no effort whatsoever to serve Dr. Wank during the twenty-two month interval between June 15, 1990, when Bigansky was notified that the writ had not been served, and April 24, 1992, when the writ was reissued in accordance with Rule 401(b). Consequently, Bigansky's lack of any effort to notify Dr. Wank of the action during the twenty-two month interval constituted the abuse and unfairness which *Lamp* and its progeny sought to prevent.

Additionally, Bigansky has not demonstrated that the efforts to serve Dr. Wank following the May 7, 1990 issuance of the writ, and following the April 24, 1992 reissuance of the writ constituted a good faith effort to notify Dr. Wank of this action. As noted, it is the plaintiff's burden to demonstrate that her efforts were reasonable. *Cahill, supra,* 434 Pa.Super. 332, 643 A.2d 121. After the praecipe for writ of summons was issued on May 7, 1990, service on Dr. Wank was attempted at Jefferson Hospital. Jefferson Hospital did not accept service for Dr. Wank.

Bigansky's failure to successfully serve Dr. Wank may have been the result of simple neglect or mistake. Simple neglect or mistake in failing to fulfill the responsibility that the requirements for service are met may be sufficient to violate the good faith standard set forth in *Lamp. Rosenberg, supra,* 408 Pa.Super. 502, 597 A.2d 145. "[I]t is not necessary the plaintiff's conduct be such that it constitutes some bad faith or overt attempt to delay before the rule of *Lamp* will apply." *Ferrara,* 431 Pa.Super. at 410, 636 A.2d at 1152 (quoting *Rosenberg,* 408 Pa.Super. at 509–10, 597 A.2d at 148); *see also Rosenberg, supra,* 408 Pa.Super 502, 597 A.2d 145 (holding that plaintiff's inadvertent service at the defendant's incorrect address, after having received defendant's correct address from the post office, lacked reasonableness and good faith); *Wible v. Apanowicz,* 306 Pa.Super. 262, 452 A.2d 545 (1982) (holding that it is reasonable to expect that a plaintiff, if he knows that process could not be served at a given address, will employ some alternative means to effectuate service).

Nevertheless, as noted above, even if we were to assume that Bigansky's attempts to serve Dr. Wank constituted good faith efforts, Bigansky would still be unable to overcome the twenty-two month interval of total inactivity on her part. Consequently, we find that Bigansky's failure to take any action to even attempt to serve Dr. Wank during the twenty-two months following the return of the original writ in June, 1990, constituted a violation of the good faith effort to keep an action alive required by the Supreme Court in *Lamp.*

■ With regard to Bigansky's products liability cause of action against Dr. Wank under § 402A of the Restatement

(Second) of Torts (1965) for the implantation of allegedly defective prosthetics, her claim is totally devoid of merit. Bigansky claims that she could not have known that proplast implants were used by Dr. Wank until the second surgery on April 24, 1990. This court held in *Cafazzo v. Central Medical Health Serv., Inc.,* 430 Pa.Super. 480, 635 A.2d 151 (1993), that, as the result of implantation of a defective prosthetic, liability should not be extended to a physician, or a hospital, based on a theory of strict products liability under § 402A of the Restatement (Second) of Torts. The plaintiff in *Cafazzo,* just like the plaintiff in the present case, instituted a lawsuit after the alleged implantation into the plaintiff's jaw of a prosthetic device known as proplast implants. We held that physicians were not in the business of manufacturing or selling products, but rather were in the business of providing medical services and, therefore, the manufacturer, not the physician, should be pursued for any potential relief. *Cafazzo,* 430 Pa.Super. at 486–88, 635 A.2d at 154–55.

In view of the foregoing, we find that the trial court properly concluded that Bigansky engaged in a course of conduct that stalled the legal process and that it was unreasonable for Dr. Wank not to have been served with this action for more than two years after the original filing of the writ and over four years after the surgery. Accordingly, the trial court did not err or abuse its discretion when it granted summary judgment in favor of Dr. Wank. *Hetrick, supra,* 415 Pa.Super. 189, 608 A.2d 1074.

Order affirmed.